**ESSEX COUNTY PRESERVATION AS-SOCIATION on behalf of Itself and its Members, et al., Plaintiffs,**

v.

**Bruce CAMPBELL, as Commissioner, Massachusetts Department of Public Works, et al., Defendants.**

**Civ. A. No. 74-2680-M.**

United States District Court,
D. Massachusetts.

July 9, 1975.

Thomas B. Arnold, Epstein, Salloway & Kaplan, Boston, Mass., Haynes N. Johnson, Stamford, Conn., Herman Snyder, Boston, Mass., for plaintiffs.

William A. Brown, Asst. U. S. Atty., for the District of Massachusetts, Dennis L. Ditelberg, Asst. Atty. Gen., for the Commonwealth of Massachusetts, Boston, Mass., for defendants.

## OPINION

BOWNES, District Judge, Sitting by Designation.

This is a petition for a preliminary injunction based on a complaint in which the plaintiffs allege that the defendants have knowingly failed to fulfill their obligations of good faith compliance with the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* Jurisdiction is pursuant to 5 U.S. C. §§ 701–706 and 28 U.S.C. § 1331.

Counsel have agreed that only the first and third causes of action as set forth in the complaint are in issue as far as the preliminary injunction is concerned.

The plaintiffs seek to enjoin any further work involving the reconstruction and widening of a portion of Interstate Route 95 from four to eight lanes. The road in question begins at the Danvers-Middleton Town Line approximately eighteen miles north of Boston and ends at the Merrimack River at the north edge of Newburyport, approximately three miles south of the New Hampshire border. The highway to be widened is a four lane divided highway passing through the Towns of Middleton, Topsfield, Boxford, Rowley, Georgetown, Newbury, West Newbury, and the City of Newburyport. The southern terminus of the proposed reconstruction will join an eight lane highway connecting to Route 128. The northern terminus will connect to the New Hampshire section of Route I–95 running from the Merrimack River to the City of Portsmouth. The New Hampshire section is currently being widened to eight lanes. Interstate Route 95 is the major north-south route on the Atlantic Coast and provides a direct route from the urban centers of the Atlantic seaboard to New Hampshire, Maine, and the Maritime Provinces of Canada.

A hearing was held on the motion for a preliminary injunction on June 27, 1975, at the Federal Courthouse in Boston. At the hearing, I made several rulings affecting the posture of the case which I now reiterate. I rule that, in determining whether or not the requirements of NEPA have been met, a federal court has neither the duty nor, indeed, the right to engage in a substantive review and in-depth analysis of the Environmental Impact Statement (EIS). The role of the court is restricted to determining whether or not the EIS meets the procedural requirements of NEPA. The plaintiffs claim that the EIS is defective because it failed to take into consideration the so-called energy crisis. I rule now, as I ruled at the hearing, that

the question of whether or not there is an energy crisis and, if so, the impact of such a crisis on automobile traffic in Massachusetts is highly speculative and need not, as a matter of law, be considered in formulating the EIS. I exclude now, as I excluded at the hearing, any evidence as to the validity and accuracy of traffic counts. As stated at the hearing, I consider all affidavits and exhibits that have been filed to be evidence and part of the record in this case.

■ The pleadings and exhibits show that the basis of the opposition to the reconstruction and widening of I–95 is that such reconstruction is not justified because, as a result of a combination of the energy crisis and the Sargeant moratorium, there will be a reduction in traffic or, at least, the increase predicted by the highway officials will not materialize. While I take judicial notice of the fact that any increase in the size of a highway is bound to have some deleterious effect on the environment, there is no claim here that any portion of the area affected is particularly fragile or will be harmed to an extent beyond that which is ordinarily to be anticipated by highway reconstruction.

Before treating the legal issues, certain basic facts must be noted. The final EIS was published in September of 1973, and was approved by the Department of Transportation in January of 1974. This suit was instituted July 17, 1974, and plaintiffs' request for a temporary restraining order was denied on the same day. The project is divided into four contracts:

*First Contract*—Total price, $14,879,- 387; length, 4.4 miles; completion date, November 6, 1976; status of construction as of June 25, 1975, 36% complete.

*Second Contract*—Total price, $18,- 889,858; length, 5.7 miles; completion date, July 30, 1977; status of construction as of June 25, 1975, 10% complete.

*Third Contract*—Total price, $11,577,- 499; length, 4.1 miles; completion date, July 30, 1977; status of construction as of June 25, 1975, 13% complete.

*Fourth Contract*—Total price, $9,246,- 210; length, 2.7 miles; completion date, November 27, 1976; status of construction as of June 25, 1975, 25% complete.

There are three main issues:

(1) Whether the preparation of the EIS by Fay, Spofford and Thorndike was fatally defective because it was also design engineer for part of the project;

(2) Whether the moratorium on highway construction in the Boston area imposed by Governor Sargeant prior to the start of construction on this project was considered sufficiently in the EIS and, if not, whether such failure requires a supplement to the EIS; and

(3) Whether federal funding was improperly given because of the Commonwealth's failure to timely prepare an Action Plan pursuant to 23 U.S.C. § 109(h).

### THE ROLE OF FAY, SPOF- FORD AND THORNDIKE

The first issue is whether NEPA proscribes the delegation of EIS preparation to a State employed private consulting firm that is also the design engineer for a portion of the project in question.[1]

NEPA requires that the "responsible official" prepare and circulate to the public and various commenting agencies, a detailed statement disclosing the adverse environmental effects of any "major Federal action significantly affecting the quality of the human environment, . . . ." 42 U.S.C. § 4332(C).

There is a present split in the Circuits on the issue of whether the federal agency may delegate the preparation of the EIS to a state agency.

The Second Circuit held in *Conservation Soc. of S. Ver., Inc. v. Secretary of Tran.*, 508 F.2d 927 (2nd Cir. 1974), *Petition for cert. filed, sub nom., Coleman v. Conservation Society of Southern Vermont, Inc.*, 43 U.S.L.W. 3648 (U.S.

---

1. Fay, Spofford and Thorndike is responsible for contracts three and four, totalling 6.8 miles.

May 9, 1975) (No. 74–1413), that the FHWA has an exclusive nondelegable duty to prepare the EIS.[2] Other Circuits have held that the responsibility for preparing an EIS may be delegated to state agencies, provided that there is "significant federal participation." *Fayetville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021 (4th Cir. 1975); *Sierra Club v. Lynn,* 502 F.2d 43 (5th Cir. 1974); *Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849 (8th Cir. 1973); *Life of the Land v. Brinegar,* 485 F.2d 460 (9th Cir. 1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), and *Citizens Environmental Council v. Volpe,* 484 F.2d 870 (10th Cir. 1973).

■ The Council for Environmental Quality (CEQ) "has traditionally not objected to delegation of the preparation of a statement in those instances where the Federal agency has maintained responsibility for the objectivity and adequacy of the statement." *The Fifth Annual Report of the Council on Environmental Quality* at 397–398 (1974). *See also* PPM 90–1, 23 C.F.R.App. A ¶ 6(2)(b), which provides that the State Highway Department shall prepare and circulate a draft EIS "in cooperation with the FHWA during the location study." As the enforcing agency in which the statutory responsibility for the review and promulgation of a federal environmental program is vested, 42 U.S.C. § 4344, the CEQ's interpretation of the Act is entitled to great deference. *Griggs v. Duke Power Co.,* 401 U.S. 424, 434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *But see I–291 Why? Association v. Burns,* 372 F.Supp. 223, 246 (D. Conn.1974) and the cases cited therein, holding:

> that PPM 90–1's delegation to state highway departments of primary responsibility for the preparation and writing of EIS's for highway projects proposed for FHWA funding, cannot

be squared with *Greene County's* construction of NEPA as requiring that the federal agency charged with compliance with NEPA itself prepare the final EIS.

*See also Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849 (8th Cir. 1973) (Lay, J., dissenting).

The hazards in interpreting NEPA so as to allow the FHWA to delegate its responsibility to interested agencies or parties has been judicially recognized. *Conservation Society, supra,* 508 F.2d at 930–933. I also recognize that the present standards of "good faith" and "sufficient federal participation" are litigious judgments which breed law suits while failing to provide clear and definite administrative standards. *See I–291 Why?, supra,* 372 F.Supp., n.72 at 246–247.

On the other hand, to require exclusive FHWA preparation of every EIS without any state assistance is to promote duplication of administrative effort and expense. A *per se* rule of exclusion whenever the FHWA relies on state prepared and gathered data is to exalt form over substance by the adoption of a rigid judicial rule. Courts should always bear in mind, when establishing judicial guidelines, that while NEPA's procedural requirements are not rubber, neither should they be iron. *National Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 837 (1972).

■ While I believe that there should be some latitude in allowing the federal agency to delegate EIS responsibility to the State, it is another matter when the State, in turn, delegates its responsibility to a private firm which is also the design engineer for a portion of the project and has a concomitant financial interest in its approval and completion.

In *Life of the Land, supra,* the Court held that there was no violation of

---

2. As a result of the Second Circuit decision, legislation was proposed which would grant state agencies the authority to prepare the initial EIS on federally funded highways. *See* H.R. 3129; H.R. 3516; and H.R. 3787.

NEPA when a private consulting firm which had designed a runway project also participated in the drafting of the EIS. The Court stated:

> It does appear from the record that Parsons had a financial interest in an affirmative decision on the proposed project. We find nothing, however, in either the wording of NEPA or the case law, which indicates that, as a matter of law, a firm with a financial interest in the project may not assist with the drafting of the EIS. Id. 485 F.2d at 467.

*See also Sierra Club* v. *Lynn*, 502 F.2d 43, 59 (5th Cir. 1974).

In conflict with *Life of the Land* is *Greene County Planning Board* v. *Federal Power Commission*, 455 F.2d 412 (2d Cir.), *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972) and its Second Circuit progeny. *Conservation Society, supra; I–291 Why? Association* v. *Burns, supra*; *Committee to Stop Route 7* v. *Volpe*, 346 F.Supp. 731 (D.Conn. 1972).

Defendants argue that the activities of Fay, Spofford and Thorndike were regulated and supervised by the Commonwealth and that there was sufficient federal input to overcome any conflict of interest inherent in Fay, Spofford and Thorndike being both the design engineer and preparer of the EIS. Frederick H. Downs, who was Chairman of the Environmental Committee that was set up by the Boston Division of the Federal Highway Department, testified, in effect, as follows. He reviewed and approved the award of the contract to Fay, Spofford and Thorndike and, although there was some discussion about a conflict of interest, he did not think that the corporation's work as design engineer would interfere with or influence its work as preparer of the EIS. Subsequent to the awarding of the contract, Downs participated in meetings with Fay, Spofford and Thorndike and Massachusetts Highway Officials. Downs testified emphatically: "We were responsible for the EIS and there was a tremendous amount of input by FHWA." This was the first EIS in the Boston area and Downs said that everyone wanted to see that a good job was done on it. The preliminary draft of the EIS was reviewed by the FHWA Environmental Committee and comments were made by each member of the Committee. A meeting was then held with Fay, Spofford and Thorndike and the Massachusetts Department of Public Works to discuss the contents of the draft EIS. Another meeting was held with the same parties to discuss policy decisions raised by the draft EIS. In addition, there was continual telephone contact with Fay, Spofford and Thorndike and they were being checked continuously by him and by the Massachusetts Department of Public Works. Downs testified that there was nothing in the EIS that was not reviewed and approved by him and Mr. Elinsky, Downs' superior and Assistant Division Engineer during preparation of the EIS. The Regional Office of FHWA also reviewed the draft EIS and, after it was completed, the Environmental Committee obtained comments from the different agencies involved. Downs reviewed the agency comments and also went over the alternates as outlined in the draft EIS. There were many comments, particularly in regard to noise pollution, and several public meetings were held on this particular problem. As a result of the comments and meetings, a change of plans was made relative to the clover leaf at Storey Avenue in Newburyport.

On cross-examination, Mr. Downs admitted that there was always pressure to get things done quickly on a highway job. He said that there were three basic meetings involving Fay, Spofford and Thorndike: (1) to determine what had been done in regard to data gathering; (2) for policy review; and (3) for draft comment review.

He stated that thirty-six policy decisions were made. Downs testified that it is the policy of FHWA to let others do the work for them and then, after re-

view, to accept the work as its own. The fact that Fay, Spofford and Thorndike was also the design engineer on a portion of the project did not bother Downs at all. He did admit in answer to a question by the court that the FHWA has to rely on those who prepare the EIS for gathering and collating the basic data. In answer to a question as to why certain letters were omitted from the EIS, Downs explained that internal letters between members of the FHWA are not included in the EIS.

Raymond Bova, another Highway Engineer for the Federal Government, was part of the Environmental Committee on I–95. He also reviewed the proposal for the contract with Fay, Spofford and Thorndike and made recommendations as to the scope of the contract and as to what changes were to be made in it.

Richard W. Albrecht, one of the vice-presidents of Fay, Spofford and Thorndike and the assistant project manager for preparing the EIS, testified as to his company's dual role as design engineer and preparer of the EIS. The design contract was dated in 1968 and the EIS contract was signed in 1972. At the time the EIS contract was entered into, the design contract was 85% complete. In order to complete the EIS, Fay, Spofford and Thorndike obtained the services of consultants in air and sound pollution from the Environmental Impact Center of Cambridge, Massachusetts. Albrecht testified that the actual construction of the project had very little effect on the design contract. He acknowledged that the question of conflict of interest did come up briefly at the time that his company was negotiating with the State for the EIS contract. According to Albrecht, although there was some overlapping of personnel, most of the work performed on the EIS was done by departments different than the design engineering department. Albrecht further testified that when the EIS mandated changes in the design, his company expected to and did receive extra compensation for design changes

that had to be made. The normal communication relative to the EIS was between Fay, Spofford and Thorndike and the Massachusetts Department of Public Works.

Based on the foregoing testimony, I find that there was considerable federal review, discussion, and revision of the EIS as it was being developed by Fay, Spofford and Thorndike. There was also continuous review conducted by the Massachusetts Highway Department. There is no doubt, however, that both FHWA and MHD relied solely on Fay, Spofford and Thorndike to gather and collate the basic environmental data. When the one preparing the EIS has a financial and professional interest in the approval of the project and has participated in it, there is always a danger that essential base data may be carelessly discarded or buried beneath a pile of benign facts. In fairness, it must be stated that a reading of the EIS reveals that it is comprehensive, clearly written, covers all the environmental consequences raised by the widening of the highway, is well documented, and, with the exception of the Energy Commission, was distributed to all federal, state, and local agencies with any possible interest in the project. I must also note that the Sierra Club of New England stated that the EIS "is the best impact statement I have seen to date." (Letter written by Ernest V. Loewenstein, Transportation Issues Coordinator, p. A–79 EIS.)

█ The issue is, however, not the quality and the content of the EIS, but whether or not, under these circumstances, it meets the procedural requirements of NEPA. I find that it does not. The purpose of NEPA is to get all the cards on the table prior to "any irreversible and irretrievable commitments of resources . . . ." 42 U.S.C. § 4332(C)(v). The possibility that a financially interested party may unconsciously stack the deck is one that I cannot ignore.

## THE SARGEANT MORATORIUM AND THE NEED FOR A SUPPLEMENTAL EIS

The second issue is whether the Sargeant moratorium and the redesignation of Route 128 as part of the I–95 system had a significant effect on the environment requiring the preparation of a supplemental EIS.

PPM 90–1, 23 C.F.R.App. A ¶ 6(p)(1) provides:

A new environmental statement, or a supplemental statement will be necessary for a highway section when the proposal being processed introduces a new or changed environmental effect of significance to the quality of environment.

The Governor's decision to place a moratorium on the construction of I–95 south of Route 128 was announced in November, 1972, too late for inclusion in the draft EIS.

The Governor's decision to delete the southerly portion of I–95 surfaced in the final EIS with the comment:

The forecasts were reassessed in the light of the Governor's policy decisions and the updated EMRPP traffic network and were found to remain valid and indicative of the realistic growth potential of traffic in this corridor . . . . EIS at 1–35.

In support of this statement, the EIS refers to a letter from Robert T. Tierney, Chief Engineer of the Massachusetts Department of Public Works, to Emil Elinsky, Assistant Division Engineer of the FHWA. The Tierney letter states in part:

In reviewing our latest analysis of the corridor potential of I–95 from the vicinity of Route 1 Danvers to the New Hampshire line, it is evident that the need for an eight-lane divided highway on almost all links appears justified, whether or not I–95 is constructed south of Route 128 in Peabody. Page A–18, EIS.

The FHWA was aware that the Sargeant moratorium called into question the necessity of expanding I–95 into an eight lane corridor.

The effects of these changes in the system will be reflected in the present and future traffic . . . which can significantly affect the forecasts for other routes and segments that are not being eliminated. Viewed from this point then, the considerations on which the design of I–95 north of Route 128 was based have been substantially altered. We recognize that the Federal Highway Administration's previous approval of the basic design is correspondingly nullified since some important criteria on which it was based are being superseded by other conditions. (Letter from Elinsky to Tierney, Plaintiffs' Ex. 25)

It is interesting to note that this letter was not included in the EIS due to FHWA's policy that internal memoranda are not to be included in the EIS. At the hearing, Elinsky explained the use of the word "nullify" by saying that he meant that any further action should be held in abeyance until the Commonwealth could justify the need for eight lanes.

The question of whether the construction moratorium has a significant effect on the quality of the environment is a value judgment which defies discernible judicial parameters. I cannot determine, as a matter of law, that the moratorium will have a significant effect on the quality of the environment. At first blush, it appears that it will be beneficial because the result will be the reduction of automobile traffic. I realize, however, that an argument can be cogently made that there will be no overall reduction in automobile traffic, but that the traffic will be concentrated more heavily on existing highways.

The heart of plaintiffs' argument, however, is that the public has not had the opportunity to analyze and assess the State's decision to continue with the reconstruction of the northerly portion of I–95. There is no doubt that the

traffic analysis and data which enabled the State to conclude that the moratorium would not affect the need for reconstruction was not subject to public review or comment. Plaintiffs charge that by failing to prepare and circulate a supplemental EIS, the public has never had an opportunity to critically assess and evaluate the State's traffic data and the conclusions drawn therefrom. *See Appalachian Mountain Club* v. *Brinegar*, 394 F.Supp. 105 (D.N.H.1975). Neither plaintiffs nor defendants have cited any case which holds that, in a similar situation, NEPA requires a supplemental EIS.

NEPA is an environmental disclosure law. The Act mandates that "action can be taken only following complete awareness on the part of the actor of the environmental consequences of his action. . . ." *National Helium Corp.* v. *Morton*, 455 F.2d 650, 656 (10th Cir. 1971). In order to effectuate the disclosure aspects of NEPA and to provide the actor with complete awareness of the possible environmental effects of his action a draft EIS is circulated to the public and various commenting agencies.

This is the vital stage, "for it is here that the outside review can vitiate 'objective errors or excessive bias in an EIS.' *I–291 Why? Association, supra*, 372 F.Supp. at 258." *Appalachian Mountain Club, supra*, at 121.

The State's position that present and future traffic demands still dictate the widening of I–95 appears as a *fait accompli* in the final EIS. Neither the public nor any commenting agencies had the opportunity to question or highlight possible errors in the State's position. The final EIS receives only in-house review. It is not subjected to the searching critical analysis that occurs in the draft stage.

There cannot be responsible decision-making when data appears in the final EIS without being subject to the critical evaluation that occurs in the draft stage. There are two dangers that can occur when information appears in the final EIS for the first time: (1) the ultimate decisionmakers will believe that there is no controversy due to the lack of critical comment; and (2) objective errors without being red-flagged would go unnoticed. *Appalachian Mountain Club, supra*, at 121.

■ When reviewing an agency's threshold determination not to file an EIS, the court applies the "reasonable" standard. *Save Our Ten Acres* v. *Kreger*, 472 F.2d 463 (5th Cir. 1973). The "rule of reason" should pervade judicial construction of NEPA. The question is, therefore, whether it was reasonable for the FHWA to fail to prepare a supplemental EIS informing the public of the vital change in the recommended regional plan.

■ The purpose of exposing environmental problems at the "earliest possible point" is to bring to light the various "environmental tradeoffs" that may occur when one course of action is chosen over another. *Environmental Defense Fund, Inc.* v. *Froehlke*, 473 F.2d 346, 350 (8th Cir. 1972). NEPA instills into the decisional process the element of considered reflection and evaluation. I find that NEPA requires the defendants to prepare and circulate a supplemental EIS which is directed to the impact that the Sargeant moratorium will have on the project in question.

## TIMELINESS OF THE ACTION PLAN

The third issue is whether the State was required to submit an Action Plan prior to final FHWA project approval.

23 U.S.C. § 109(h) (Supp.1975) provides:

> Not later than July 1, 1972, the Secretary, after consultation with appropriate Federal and State officials, shall submit to Congress, and not later than 90 days after such submission, promulgate guidelines designed to assure that possible adverse economic,

social, and environmental effects relating to any proposed project on any Federal-aid system have been fully considered in developing such project, and that the final decisions on the project are made in the best overall public interest, taking into consideration the need for fast, safe and efficient transportation, public services, and the costs of eliminating or minimizing such adverse effects and the following:

(1) air, noise, and water pollution;

(2) destruction or disruption of man-made and natural resources, aesthetic values, community cohesion and the availability of public facilities and services;

(3) adverse employment effects, and tax and property value losses;

(4) injurious displacement of people, businesses and farms; and

(5) disruption of desirable community and regional growth.

Such guidelines shall apply to all proposed projects with respect to which plans, specifications, and estimates are approved by the Secretary after the issuance of such guidelines.

To implement this Section, the provisions of 23 C.F.R. § 795 provide that each state shall develop and submit to the FHWA an Action Plan which describes the economic, environmental, and social effects of highway construction. 23 C.F.R. § 795.5(g) provides:

The Action Plan should be submitted to the FHWA not later than June 15, 1973, for approval. The FHWA will not give location approval on projects after November 1, 1973, unless the Action Plan has been approved.

The regulations provide further that these guidelines are not to be retroactively applied to projects that have already been developed.

These guidelines and the Action Plan shall only be applied to the fu-ture development of on-going projects and to future projects. They are not retroactive, and shall not apply to any step or steps taken in the development of a project prior to the time of the implementation of the parts of the Action Plan applicable thereto. 23 C.F.R. § 795.4(d).

The Massachusetts Action Plan was submitted to the FHWA on April 29, 1974, and approved on July 12, 1974. Construction on the project began in June of 1974.

Defendants contend that an Action Plan was not necessary because location approval was given by the FHWA prior to November 1, 1973. The EIS indicates that FHWA design approval was given to the Middleton to Boxford segment on September 25, 1968; Boxford to Georgetown on July 18, 1969; and Georgetown to Newburyport on May 6, 1969. (EIS at 1–5). The FHWA did not give plans, specifications, and estimates (PS&E) approval until May 20, 1974.

Courts, in interpreting the guidelines promulgated pursuant to NEPA, have held that interim guidelines do not excuse the FHWA's failure to prepare an EIS. *See Steubing* v. *Brinegar*, 511 F. 2d 489, n. 6 at 493 (2d Cir. 1975) and the cases cited therein. *Contra, Robinswood Community Club* v. *Volpe*, 506 F.2d 1366 (9th Cir. 1974).

■ In *Movement Against Destruction* v. *Volpe*, 361 F.Supp. 1360, 1401 (D.Md.1973), *aff'd*, 500 F.2d 29 (4th Cir. 1974), the Court held that the proposed section 109(h) guidelines were "applicable to a proposed highway project which had not received PS&E approval by September 21, 1972 . . . ." While development and design of the instant project may have been completed in 1969, final PS&E approval was not given until May of 1974. It is only when final PS&E approval is given that the FHWA becomes financially committed to the project.

Neither location approval nor design approval by the FHWA creates a

contractual obligation on the part of the federal government to reimburse a state for costs incurred in the project. There is one more stage to be completed before the federal government is finally committed to the project. This is called plans, specifications and estimates approval (PS&E approval). *Lathan* v. *Brinegar*, 506 F.2d 677, 686 (9th Cir. 1974).

PPM 90–4, containing the guidelines required by section 109(h), was issued on September 21, 1972. I find that the FHWA was statutorily required to have approved the State Action Plan prior to its granting PS&E approval. Accordingly, its PS&E approval on May 20, 1974, was both illegal and improper.

Although plaintiffs have established a technical noncompliance with 23 U.S.C. § 109(h), they have failed to assert that this violation will cause or has caused any environmental harm. I do not treat lightly defendants' violation of the Highway Act, but I do not believe that noncompliance mandates the FHWA to withhold PS&E approval "until all previous approvals, such as the location approval in this case, are completely reviewed and all prerequisites are complied with again." *MAD, supra,* 361 F. Supp. at 1401.

An Action Plan, unlike an EIS, is not a detailed environmental analysis of a specific segment of proposed construction. Neither is it an environmental disclosure act. Instead, the Plan provides an overall framework in which the state looks "closely at its own transportation planning process, and, with the help of public officials and private citizens alike, to improve this process. . . . [It is] a collective effort to open and improve the way in which decisions are reached on highway projects." Action Plan at 2.

I note that the Action Plan was finally approved by the FHWA a month and one-half after PS&E approval was given. Under the totality of the circumstances, I find that defendants' failure to comply with section 109(h) is not an important factor to be weighed in determining whether or not an injunction should issue.

## CONCLUSIONS

I now address myself to the difficult question of whether, under these facts, and given the uncertain state of law in this field, a preliminary injunction should issue. In determining this, some courts have held that if NEPA has been violated, then the "court should not inquire into the traditional requirements for equitable relief." *Atchison, Topeka & Santa Fe Railway Co.* v. *Callaway,* 382 F.Supp. 610, 623 (D.D.C.1974). Other courts disagree and consider equities in fashioning a remedy despite the fact that NEPA has been violated. *Sierra Club* v. *Callaway,* 499 F.2d 982, 988 (5th Cir. 1974) and the cases cited therein. I do not believe that there should be an ironclad rule that whenever there has been any kind of violation of NEPA, an injunction must issue. Instead, the court should assess each situation on a case-by-case basis to determine the appropriate scope of relief.

In order for a preliminary injunction to issue, the plaintiff must show three things: (1) that there will be irreparable harm; (2) that there is a probability of success on the merits; and (3) that the public interest requires the issuance of the injunction.

The question of irreparable harm is a difficult one. Any highway widening is going to destroy grass and trees and such harm is certainly irreparable, but whether it justifies an injunction is another question. The project in question is a small link in the eight lane interstate coastal highway system connecting the megalopolis areas of the Atlantic Coast with the vacation areas of New Hampshire, Maine, and the Maritime Provinces of Canada. The pleadings, exhibits, and documents make it clear that the focus of the opposition is not on

the irreparable harm to the environment, but that the reconstruction is not justified because the traffic will diminish in the future or, at least, not increase significantly due to the effects of the energy crisis and the Sargeant moratorium. As noted in the beginning, I have ruled that the question of whether or not traffic will increase or decrease in the future is not for this court to determine.

In considering the issue of irreparable harm, I must also take into consideration the fact that the final EIS was published in September of 1973, and legal action in this case was not instituted until July of 1974, after highway construction had started. While I recognize that in environmental cases, laches is not judicially favored as a defense, the fact of the matter is that, while the plaintiffs here may not have slept on their rights, they certainly took a long nap.[3] Nor can I blink my eyes to the fact that the Federal and State Highway Officials, with full knowledge that a suit had been filed against them, continued construction on the project, if not at breakneck speed, at least with full measured tread. Another factor that is part of the background and which cannot be laid at the doorstep of either party is the eleven-month delay between the filing of the suit and the hearing on the motion for a preliminary injunction. To further muddy the waters, on the day before the hearing, a letter was filed with the court from the Chief Engineer of the Commonwealth to DeMatteo Construction Company. The letter, which is dated May 30, 1975, states:

> You are directed to defer until further notice all bituminous paving on the median side—twelve feet in width—on the Route I–95 roadway. We shall advise you as soon as possible therefore if or when this twelve foot section may be paved.

There was no testimony at the hearing as to the significance of this letter and as to whether or not it signified a decisional change on the part of the Commonwealth. The only testimony in regard to it was by Mr. Turner, Former Division Engineer for FHWA in Boston, who stated that the Federal Government did not approve of the State's announcement, and that it had consistently recommended against limiting the highway to six lanes.

The question of whether or not the violations of NEPA justify an injunction leads directly to the second issue of whether the plaintiffs have proven that there is a probability of success on the merits. I must recognize that there is a split of authority between the Circuits on the question of whether or not an EIS must be exclusively prepared by federal officials or whether its preparation can be delegated to state officials. The Act is silent on this point and I am aware that certiorari is sought in a case involving this precise question. *Conservation Society, supra.* The only case directly on the point of the Fay, Spofford and Thorndike situation holds squarely that the fact that a design engineer also prepares the EIS does not violate NEPA. *Life of the Land, supra.* While my finding is to the contrary, I cannot confidently predict how the Circuit Court of Appeals will rule.

The same legal uncertainty exists in regard to defendants' failure to file a supplemental EIS relative to the impact of the Sargeant moratorium. The law is not at all clear that such a failure is sufficient grounds to halt a project as far along as this one. Similarly, there is no precedent for issuing a preliminary injunction in circumstances such as this for failure to file an Action Plan strictly on schedule.

Stripped to its essentials, the basic underlying issue is whether, under

**3.** *See Steubing v. Brinegar, supra,* 511 F.2d at 495; *Jones v. Lynn,* 477 F.2d 885, 892 (1st Cir. 1973); *Arlington Coalition on Transportation v. Volpe,* 458 F.2d 1323, 1329–1330 (4th Cir. 1972). *But see Smith v. Schlesinger,* 371 F.Supp. 559, 561 (C.D.Calif.1974) and the cases cited therein.

NEPA, an injunction must be issued solely for the prophylactic effect that it would have on State and Federal Highway Officials.

### FINDINGS AND RULINGS

1. Balancing the equities and taking all of the factors into consideration, I do not find that irreparable harm will result if construction is not halted.

2. I cannot find, based on the state of the law at the present time, that there is a probability of success on the merits.

3. I am unable to find, under all of the circumstances, that the public interest requires the issuing of an injunction at this time.

The plaintiffs' motion for a preliminary injunction is therefore denied.

So ordered.