**NEW HANOVER TOWNSHIP, Paradise Watchdogs, and Beverly Ream**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS.**

Civ. A. No. 91–2705.

United States District Court, E.D. Pennsylvania.

June 1, 1992.

Mary Ann Rossi, Albert J. Slap, John E. Childe, Jr., Fox, Rothschild, O'Brien & Frankel, Hummelstown, Pa., for plaintiffs.

Joan K. Garver, U.S. Attys. Office, Philadelphia, Pa., Seth M. Barsky, U.S. Dept. of Justice, Environmental & Natural Resources Div., Washington, D.C., for defendant.

## OPINION

CAHN, District Judge.

Plaintiffs are asking this court to set aside a determination by the Army Corps of Engineers ("Corps") that the New Hanover Corporation ("NHC") qualifies for a federal permit that would allow the filling of wetlands in order to construct a municipal waste landfill ("Landfill") in New Hanover Township. Plaintiffs allege that the Corps' determination that NHC had satisfied the requirements for a "nationwide" permit 26 ("NWP 26") under section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, was an abuse of discretion and not in accordance with law, and that the Corps should have required NHC to satisfy the

requirements for an "individual" permit pursuant to section 404(b) of the CWA.[1]

Plaintiffs filed a motion for summary judgment to which the Corps responded by filing a crossmotion for summary judgment. At oral argument on April 10, 1992, both sides agreed that this court could determine the legal issues of the case based on the administrative record. Having now heard oral argument and reviewed the administrative record, I find that the Corps did not abuse its discretion.

## I. *Background*

NHC intends to construct and operate the Landfill on 57 acres of a 107 acre farm located in New Hanover Township, Montgomery Township, Pennsylvania. They have also purchased an adjacent property, the "Troise Property," as the site of a leachate treatment plant and pipeline. Both sites show evidence of some wetlands present within their borders. Upon learning of NHC's plans in July 1986, the Corps advised NHC that the Corps had jurisdiction over wetlands and that a delineation of Federal jurisdiction was advisable.[2] In 1987 the Corps concluded that the Landfill would qualify under various relevant nationwide permits.[3] In November 1987, Plaintiffs sued the Corps challenging the wetlands delineation and NHC's eligibility for a NWP 26. In August 1989, the Corps agreed to reexamine its determination pursuant to its Motion for Voluntary Remand. *See New Hanover Township v. United States Army Corps of Engineers*, No. 87-7262 (E.D.Pa.1989) (order to remand). The Corps next requested relevant information from NHC, New Hanover Township, the Pennsylvania Department of Environmental Resources ("PADER"), the United States Soil Conservation Service ("SCS"), and the Montgomery County Soil Conservation District. By September 6, 1990, the Corps revised its original jurisdictional determination: It now concluded that .96 acres of jurisdictional wetlands would be lost or substantially modified by filling activities associated with the construction of the landfill. *See* Letter of Frank Cianfrani to Richard Bodner, September 6, 1990 (hereinafter "Bodner Letter"). Accordingly, it reconfirmed its determination that the Landfill construction would qualify under

---

1. The relevant portions of the CWA read as follows:

    § 1344. Permits for dredged or fill material
    (a) Discharge into navigable waters at specified disposal sites
    The Secretary may issue permits after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites.
    . . . .
    (b) [E]ach such disposal site shall be specified for each such permit by the Secretary (1) through the application of guidelines developed by the Administrator, in conjunction with the Secretary. . . .
    . . . .
    (e) General permits on State, regional, or nationwide basis
    (1) In carrying out his functions relating to the discharge of dredged or fill material under this section, the Secretary may, after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material. . . .

2. The regulatory definition of "waters of the United States" includes wetlands adjacent to navigable waters. *See* 33 C.F.R. § 328.3(b).

3. The Corps verified that the project would qualify under NWP 7 (outfall structures); NWP 12 (utility lines and associated outfall structures); and NWP 26 (headwaters). This case relates to NWP 26 only.

    Nationwide Permit 26 allows discharges or fill material into non-tidal rivers, streams and their lakes and impoundments, including adjacent wetlands, that are located above the headwaters and other non-tidal waters that are not part of a surface tributary system unless such discharges will cause the loss or substantial adverse modification of 10 acres or more of waters of the United States including wetlands. 33 C.F.R. § 330.5(a)(26). Discharges which cause the loss or substantial adverse modification of 1 to 10 acres require pre-discharge notification to the Corps and an application for an "individual permit." *Id.* However, neither pre-discharge notification nor an "individual permit" is required for discharges that will cause the loss or substantial modification of less than 1 acre of wetlands. *Id.*

    The Corps concluded that only six acres of jurisdictional wetlands existed on the site and that only .68 acres of these wetlands would be lost or substantially modified by filling activities associated with the construction of the Landfill.

NWP 26 without an individual permit (assuming NHC received other necessary state approvals). *Id.*

Plaintiffs filed this complaint on April 26, 1991. The main thrust of their complaint is that the Corps' determination that only .96 acres of wetlands would be destroyed by the Landfill is erroneous as a matter of law or was the result of an abuse of discretion. Plaintiffs argue that the Landfill will destroy more than one acre of wetlands for the following reasons. (1) They allege that the Corps failed to delineate the wetlands in accordance with the methodology mandated by the *Federal Manual for Identifying and Delineating Jurisdictional Wetlands* ("*Federal Manual*"). (2) Plaintiffs argue that the Corps erred by not assessing the impact of the construction of the Landfill upon on-site and off-site wetlands that were not within the borders of the area that NHC planned to fill. (3) Plaintiffs argue that even if the assessment of destroyed wetlands was not in error, the Corps' determination that there were less than 10 acres of wetlands on the site overall was arbitrary and an error of law. Plaintiffs also allege that the Corps erred by not requiring NHC to comply with "Condition No. 9" of the nationwide permit program, which is designed to insure that any wetlands which may possess historic properties must be reviewed by the Advisory Council on Historic Preservation before it may qualify for a nationwide permit.

## II. *This Case Is Ripe For Review*

■ Defendant argues that this court should dismiss Plaintiff's action because it does not present issues that are ripe for judicial review. *See* Memorandum In Support of United States Army Corps of Engineers' Cross Motion For Summary Judgment and In Opposition To Plaintiffs' Motion For Summary Judgment (hereinafter "Defendant's Memorandum") at 15; *See also Abbott Laboratories v. Gardner*, 387 U.S. 136, 146–49, 87 S.Ct. 1507, 1514–15, 18 L.Ed.2d 681 (1967) (courts should not interfere with an agency decision "until [the] administrative decision has been formalized and its effects felt in a concrete way by the challenging parties"). According to the Third Circuit Court of Appeals, the ripeness doctrine requires consideration of two factors: (1) the fitness of the issues for judicial resolution, and (2) the hardship to the parties of withholding judicial review. *See CEC Energy Co. v. Public Service Comm'n.*, 891 F.2d 1107, 1109 (3d Cir. 1989).

The Corps argues that the determination announced in its letter of September 6 to NHC is not fit for judicial review because it was not a sufficiently final agency action. *See* Defendant's Memorandum at 16; *see also CEC Energy*, 891 F.2d at 1110. The Corps argues that its letter was not sufficiently final because in the same letter the Corps reminded NHC that the project's "authorization [under NWP 7, 12 & 26] is not valid until you receive a 401 Water Quality Certificate from the Pennsylvania Department of Environmental Resources" (Bodner Letter at 1), and as of the time of trial, "NHC has not obtained a valid section 401 water quality certificate from PADER." Defendant's Memorandum at 18. In oral argument, Defendant's counsel cited *Suburban Trails, Inc. v. New Jersey Transit Corp.*, 800 F.2d 361 (3d Cir.1986) as an analogy to this case. *Suburban Trails* does not speak to the issue raised by Defendant. In *Suburban Trails*, the Third Circuit Court of Appeals declared an agency determination to be not yet final because the agency's determination had to be approved by another body which as yet had not spoken. *See Suburban Trails*, 800 F.2d at 365. Here, the Corps' judgment with regard to NWP 26 is not reviewable by any other body: Although it may be true that an action by another body is a "condition precedent" for the Corps' ultimate permission, that other body has no power to review the Corps' determination of whether NHC has satisfied the conditions necessary for a NWP 26.

For similar reasons, the Corps' use of *CEC Energy* as an analogy to this case is seriously misplaced. In *CEC Energy*, the agency action in question determined that plaintiff CEC had to continue answering questions put to it by another body so the

second body could ultimately reach a final agency decision. The issue that was the object of the agency's concern was almost wholly reviewable by the second body. *See CEC Energy* at 1110–11. Clearly, *Suburban Trails* and *CEC Energy* are not like this case: Here, the Corps has completed its analysis, and nothing any other body does will change its conclusions or reasoning. If the weak link in this review process is the Corps, there is no reason not to force it to correct its error now.

### III. *The Corps' Delineation of Jurisdictional Wetlands Was Not an Abuse of Discretion Nor an Error As a Matter of Law*

■ Plaintiffs allege that the Corps' determination that there is no more than six acres of wetlands was either an abuse of discretion or erroneous as a matter of law. *See* Memorandum of Law In Support Of the Motion Of Plaintiffs For Summary Judgment (hereinafter "Plaintiff's Motion For Summary Judgment") at 11. All parties agree that the Corps is required to apply the three criteria outlined in the *Federal Manual* to identify a certain area as wetlands. Both sides basically agree as well that evidence of one of the three criteria, hydrophytic vegetation, is not available in this case because the sites in question had been used for farming, causing a destruction of the natural habitat. Both sides also agree that in the absence of evidence of the presence of hydrophytic vegetation, the other two criteria must be used to fill in the gap left by the missing third. Plaintiffs disagree with the Corps' application of the remaining criteria.

■ Of the two remaining criteria, the Corps relied more heavily on a study of the site's soils than its hydrology. *See* Summary of Project Review, New Hanover Landfill (hereinafter "Project Review") at 3 *in* Appendix in Support of United States Army Corps of Engineers's Cross Motion For Summary Judgment. The Corps discounted hydrology in this case because of

what it perceived to be unreliable water level observations. *Id.* Plaintiffs allege that the Corps' decision to discount this criterion was arbitrary and an error as a matter of law. *See* Plaintiff's Motion For Summary Judgment at 13. This allegation has no basis: Just because the Corps draws a different conclusion about the usefulness of a given criterion does not mean that it did not consider that criterion in conformity with the *Federal Manual.*

■ Plaintiffs also argue that the Corps' application of the last remaining criterion, the presence of hydric soils, was arbitrary and erroneous as a matter of law. *See* Plaintiff's Motion For Summary Judgment at 19. The gravamen of their objection here is that the Corps erroneously relied upon NHC for soil samples that were used to conclude that the Corps' analysis of soil color was, in this case, reliable evidence of the absence hydric soils. *See id.* at 17. Plaintiffs suggest that it is clearly erroneous as a matter of law for the Corps to use soil samples provided by NHC's consultants because NHC has a financial interest in this matter and has an incentive to "stack the deck." *Id.* at 20, *quoting Essex County Preservation Assoc. v. Campbell,* 399 F.Supp. 208, 214 (D.Mass.1975), *aff'd* 536 F.2d 956 (1st Cir.1976).

Plaintiffs' use of *Essex County* is simply wrong. Plaintiffs conflate the object of the district court's concern in *Essex County* (an entire Environmental Impact Statement) with the object of concern here (the submission of soil samples).[4] Notwithstanding this however, this court also notes that Plaintiffs cited the First Circuit Court of Appeal's affirmation of the district court in *Essex County* without informing the court, in their briefs or oral argument, that the First Circuit Court of Appeals *explicitly* rejected the district court's contention that NEPA (and by extension, other federal environmental legislation) prohibits federal agencies from relying on the participation of a non-federal actor. *See Essex County,*

---

**4.** Without even discussing the differences in scale between an EIS and the information obtained from NHC by the Corps, it must be noted that in *Essex County* the district court based its conclusion on an interpretation of the National Environmental Policy Act of 1969 ("NEPA"); not the CWA. *See Essex County,* 399 F.Supp. at 214.

536 F.2d at 959–60 (rejecting the district court's negative answer to the question of whether "part of the task of formulating the EIS could be carried out by a consulting firm otherwise involved in designing the ... project"). On this point the court of appeals could not have been more direct:

> [W]e are forced to disagree with the conclusion of the district court that the EIS did not meet the procedural requirements of NEPA. The significant and active involvement of [the federal agency] indicates that it did not abdicate its responsibilities and precludes us from holding there was any improper or illegal delegation [despite its reliance on outside research].

*Essex County*, 536 F.2d at 960; *see also Colony Federal Sav. & Loan Ass'n v. Harris*, 482 F.Supp. 296, 300 (W.D.Pa.1980) (*citing Essex County*).

The Corps' review of hydric soil conditions was based on information it received from the Soil Conservation Service of Montgomery County and PADER as well as the tests which were based upon the soil samples selected by NHC. There is no evidence in the record that the Corps' evaluation of the data it received was arbitrary or inconsistent with the *Federal Manual.*

## IV. *The Corps' Estimate of On–Site and Off–Site Impacts Was Not Arbitrary Or Erroneous As a Matter Of Law*

### A. On–Site Impacts

■ Plaintiffs argue that the Corps' conclusion that only .96 acres of wetlands would be disturbed by the Landfill is arbitrary and erroneous as a matter of law because it did not investigate the impact of the construction of the Landfill. Plaintiffs argue that the Corps should have been skeptical of NHC's permit application in which the footprint of the Landfill included only the area covered by the landfill itself, and not appurtenant structures or access roads, since these additional necessary supporting features would also cause the filling in of wetlands. *See* Plaintiff's Motion For Summary Judgment at 31; *see also* N.T. April 10 at 106–07.

It is not the Corps' duty to second-guess NHC's application. The Corps' job is to inform an applicant whether the project it proposes will qualify for a NWP. If the applicant gives the Corps information that bears no relationship to reality—regardless of the reason—the cost of the applicant's error falls on the applicant: No one is estopped from suing the applicant for violating the CWA if the actual project does not in fact qualify for a NWP. If NHC is going to fill more than one acre of wetlands on the Landfill site through the operation of earth moving equipment, the construction on appurtenant structures, or the building of roads, it must get an individual permit for such work or suffer the risk of prosecution by the Corps or a private suit. *See* N.T. April 10 at 108 ("[Court:] "there's no permit to fill in these other wetlands. Now if in building the roads and in stockpiling materials and that kind of thing those wetlands are filled in, then there's responsibility for working without a permit it seems to me"). The Corps' decision to evaluate the project submitted by NHC was neither an abuse of discretion nor erroneous as a matter of law

### B. Off–Site Impacts

■ Plaintiffs argue that even if the Corps's determination that the Landfill would result in the destruction of no more than .96 acres of wetlands on the site was correct, the Corps' determination that no off-site wetlands would be destroyed by the destruction of on-site wetlands was arbitrary and erroneous as a matter of law. Plaintiffs' counsel argued in court that the record reveals that the Corps was informed by Plaintiffs' experts that the destruction of on-site wetlands could seriously affect the wetlands on the adjoining Troise property:

> There is one thing in the administrative record and that is statements—a statement by the wetlands expert of New Hanover Corporation, L.E. Triegel, that there are over 50 acres of wetlands on the Troise property.... So what you have is their wetlands expert saying, yes, on this property there are over 50 acres of wetlands. We have our expert saying

a 57 acre landfill on this property is gonna dry up the 50 acres of wetlands on this property and we don't have a shred of response to that. Now that is against what the Corps is required to do under their regulatory guidance, under the CFR, under the Clean Water Act, under the case law. I don't care where you look, if there are downstream effects, they're supposed to look at them.

N.T. April 10 at 27.

Plaintiffs cite *Riverside Irr. Dist. v. Andrews,* 758 F.2d 508 (10th Cir.1985) to support their contention that the Corps must include the destruction of off-site wetlands in its calculation of the total acres of wetlands destroyed by on-site filling activities. *See Riverside,* 758 F.2d at 512. This court agrees with Plaintiff's reading of *Riverside;* however, the facts of this case suggest that the Corps' actions were consistent with its duty under *Riverside.* In *Riverside,* the Corps decided not to issue an NWP because it had evidence that destruction of less than one acre of wetlands in the course of building a dam would have a significant off-site effect that was prohibited by the CWA. There is no analogous evidence here. At various points in the record, the briefs, and oral argument, Plaintiffs argued that the construction of the Landfill would have the effect of destroying the wetlands on the Troise property. That claim may be true, but it is irrelevant to the Corps: Its only concern is the off-site effect of the filling of the .96 acres of jurisdictional wetlands discussed above. There may be many reasons why a 57 acre landfill might destroy the wetlands in the Troise property, but the only reason that engages the Corps' authority with regard to the NWP 26 is if the off-site destruction is a result of the on-site destruction of wetlands during the construction of the landfill. There is nothing in the record that suggests that the destruction of .96 acres of wetlands on-site would be the cause of material damage to any part of the 50 acres of wetlands on the adjacent Troise property. Barring a showing of such evidence in the record, the Corps' decision not investigate the off-site effect of the on-site filling was not arbitrary or an error as a matter of law. *See* N.T. April 10 at 99.

## V. *The Corps Did Not Err In Failing To Require An Individual Permit*

■ Plaintiffs argue that even if the Corps' delineation of the jurisdictional wetlands on this site is not arbitrary, the Corps erred by not exercising the discretion granted it under 33 C.F.R. § 330.8 to require an individual permit anyway. This court sees no reason to fault the Corps' decision not to treat this site as a special or unusual case. Plaintiffs cite the number of "unanswered questions" and the lack of consideration of alternative sites as evidence that this case involves "extraordinary circumstances." *See* Plaintiffs' Motion For Summary Judgment at 37–38, *quoting* Appendix B to 33 C.F.R. Part 25. This case does not strike this court as especially difficult or unusual; it should be recalled that this is the second review performed by the Corps of this project's qualification under NWP 26.

## VI. *The Corps Did Not Err In Failing To Require NHC To Comply With Condition No. 9 To the Nationwide Permits*

■ Plaintiffs argue that the Corps erred by not requiring NHC to complete a study of the Troise property's historical significance before confirming that the Landfill project satisfied the requirements for NWP 26. It is impossible to obtain an NWP if the Corps has determined that historic properties may be adversely affected by the project for which the permit is granted unless the Council on Historic Preservation has had an opportunity to comment on these effects. *See* 33 C.F.R. § 330.5(b)(9). Plaintiffs allege that the Corps knew that there was a strong possibility that there are historic artifacts on the Troise property, yet did not require that Condition 9 be satisfied by NHC before approving the NWP 26. *See* Plaintiffs' Motion For Summary Judgment at 26–27. The Corps does not deny that it knew of the possible presence of historical artifacts on the Troise property: It denies, however,

that it was obliged to require NHC to do a study of the adverse impact of the filling activities on the Troise property as of the date of trial. Defendant's Memorandum at 45.

The original plans for the Landfill envision minor filling of wetlands on the Troise property in order to construct a leachate pipeline that will take waste away from the Landfill for treatment and release in a nearby stream. This particular method of removing the leachate is not a necessary part of the Landfill's operation, but it is probably the only cost-effective means of removing the leachate, and therefore is very important to the long term viability of the project. While the total area of wetlands filled by the proposed pipeline is known and has been considered by the Corps, the Corps argues that it cannot know with certainty where the pipeline will be located since there are a number of other permits and decisions that are subject to future determination. *See* N.T. April 10 at 80. The Corps argues that the adverse impact study on the Troise property should be conducted when it is known if and when the leachate pipeline will be constructed. *See* Defendant's Memorandum at 47.

Plaintiffs object that the Corps' decision to confirm the availability of the NWP 26 for the Landfill without requiring the performance of an adverse impact study that it knows will almost certainly have to be performed in the future is an impermissible "segmentation" of the permit process. *See* Plaintiffs' Motion For Summary Judgment at 27. They argue that a necessary condition for a NWP cannot be left to future determination, since "the very existence of the landfill will influence the consideration of the [adverse] impact" study. *Id.* at 28. Plaintiffs cite *Maryland Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039 (4th Cir.1986) to support this proposition. *Maryland Conservation Council* does not stand for the broad proposition urged by Plaintiffs. In *Maryland Conservation Council*, the Fourth Circuit Court of Appeals held that nonfederal actors had to comply with NEPA's requirement for an EIS in a highway project if any future stage of the project was involved federal action. *See Maryland Conservation Council*, 808 F.2d at 1042 ("[n]on-federal actors may not be permitted to evade NEPA by completing a project without an EIS and then presenting the responsible federal agency with a *fait accompli*").

There is no danger here that the Corps will be bullied into accepting the leachate pipeline if it violates Condition 9. First, the Corps has stated in court that if NHC receives final approval for the construction of the Landfill and begins its construction before the final location of the pipeline is determined, the Corps can and will demand that an adverse impact study be performed by NHC. *See* N.T. April 10 at 80. Second, even if the construction of the Landfill begins before the pipeline receives final approval, the construction will not " 'stand like gun barrels' " over the Troise property, forcing the Corps to approve the pipeline in the face of a violation of Condition 9. *See Maryland Conservation Council*, 808 F.2d at 1042, *quoting Named Individual Members of the San Antonio Conservation Society v. Texas Highway Dept.*, 400 U.S. 968, 971, 91 S.Ct. 368, 369, 27 L.Ed.2d 388 (1970). NHC takes a risk if it invests in the Landfill before it knows whether a critical ancillary structure, such as the leachate pipeline, can be built. If the pipeline cannot be built without violating Condition 9, then the pipeline cannot be built. The subsequent cost of modifying or closing the Landfill will be borne by NHC.

## VII. *Conclusion*

The debate over the Landfill has spanned many years and courts. The case is inseparably tied to questions about how society should allocate the costs of disposing of its wastes, and who should bear the burdens of that disposal. Unfortunately, Plaintiffs have chosen the wrong avenue to express their very real concerns: I find the critique of the Corps that forms the heart of this case to be misplaced. The Corps' performance of the task presented by the voluntary remand was not arbitrary, nor was it erroneous as a matter of law.