CITIZENS AIRPORT COMMITTEE OF
CHESTERFIELD COUNTY et al.

v.

John A. VOLPE, Secretary of Trans-
portation et al.

Civ. A. No. 653–71–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Nov. 14, 1972.

Kelley E. Miller, Adkins & Miller, Richmond, Va., for plaintiffs.

Dennis Dohnel, Asst. U. S. Atty., Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs, a group of citizens of Chesterfield County, Virginia, bring this action against John A. Volpe, Secretary of the Department of Transportation (DOT) and other defendants pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq., seeking (1) a declaration that the Secretary acted contrary to law in approving the pro-

posed Chesterfield County Airport, and (2) an injunction against its construction. Plaintiffs are the Citizens Airport Committee of Chesterfield County, Virginia, and numerous named residents of Chesterfield County, Virginia. No objection has been made to the standing of any of the plaintiffs; all administrative remedies have been exhausted. The Court concludes that the matter, before it now on cross motions for summary judgment, is ready for disposition on the merits.

From an examination of the pleadings and the administrative record before it, the Court finds the following facts:

The National Airport Plan of 1969–73 proposed the construction of a new, general utility airport in Chesterfield County to act as a reliever for Byrd International Airport, Richmond, Virginia. In January, 1969, a consulting firm submitted to the County Executive of Chesterfield an Airport Site Evaluation and Selection Study, which recommended a site in what is commonly known as the Court House—Cosby Lake area.

In August and September of 1969 public hearings were held in regard to the proposed airport before the Chesterfield Planning Commission and Board of Supervisors respectively. Although no verbatim transcript was taken of these meetings, notes were prepared which reveal that considerable opposition had by that time developed to the proposed facility.

On December 28, 1970, the Chesterfield Board of Supervisors submitted to the Federal Aeronautics Agency (FAA) a request for federal funds to assist in the construction of the proposed airport. A tentative allocation of funds was made.

During 1971, the Board of Supervisors presented to the FAA a draft of an environmental impact statement required by the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 et seq. This statement was circulated to various state and federal agencies and was found to be markedly deficient.

Subsequently, additional factual reports were gathered, and the FAA, in conjunction with the Board of Supervisors, prepared a final statement. This statement was signed by a member of the FAA on July 20, 1971, and was approved by the Acting Secretary of Transportation on August 20, 1971. The statement concluded with the following:

*Federal Findings*: After careful and thorough consideration of the facts contained herein and following consideration of the views of those federal agencies having jurisdiction by law or special expertise with respect to involved environmental impacts, it is the finding of the undersigned that pursuit of the federal action is consistent with existing national environmental policies and objectives as set forth in Section 101(a) of the National Environmental Policy Act of 1969 (P.L. 91–190); that there is no feasible and prudent alternative to the proposed action; and further, that the proposed action includes all possible planning to minimize harm to the human environment and, to the extent they are involved, to public parks, recreation areas, wildlife and waterfowl refuges or historic areas. Accordingly, it is recommended that the proposed federal action regarding development of the Chesterfield County Airport be approved by the Secretary of the Department of Transportation.

The overall project was approved on September 20, 1971.

On September 21, 1971, the Citizens Airport Committee responded to the final impact statement, asserting that the document was totally unacceptable. By memorandum dated September 24, 1971, the Under Secretary requested that the FAA not proceed with the project until after a review of the data underlying the impact statement by the FAA and the Office of the Assistant Secretary for Environmental and Urban Systems (TEU). This review was completed on September 27, and a report was issued to the plaintiffs stating that the impact statement as filed was proper and cor-

rect. The Under Secretary concurred with this on September 28.

On October 5, 1971, a grant offer was made by the FAA, which was accepted by the Board of Supervisors on October 6, 1971.

Plaintiffs' attacks against the federal approval and funding of this proposed airport facility are myriad.

## I.

■ It is first asserted that the Secretary's approval of the project was without support of substantial evidence in the record. Under the Airport and Airway Development Act of 1970, 49 U. S.C. § 1701 et seq., the Secretary is required to determine to his satisfaction that certain prerequisites are met before approving a project. These include the following:

a/ that the subject project is consistent with area development plans; b/ that sufficient independent funding exists; that c/ no undue delay will be incurred in completion of the project; d/ that the sponsor has legal authority to engage in the project proposal; e/ that such other sponsorship requirements as may be applicable can be met; f/ that sufficient title is, or will be, obtained by the applicable authority with regard to necessary realty; g/ that sufficient provisions for landing aids have been included in the project plans; h/ that "fair consideration" has been given to local community interests; and i/ that environmental interests are protected and/or otherwise provided for to the fullest extent possible. 49 U.S.C. § 1716 (c).

Plaintiffs' contention is that the Court must be satisfied that the Secretary's conclusion that these prerequisites have been met is supported by substantial evidence. This contention in light of the pertinent statutes must fail. Section 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706, provides that the substantial evidence test be applied only when the agency action is taken pursuant to a rulemaking provision of the APA or when the action is based solely on a public adjudicatory hearing. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 414, 91 S. Ct. 814, 28 L.Ed.2d 136 (1971). Neither of those narrow, specifically limited situations apply in the instant case. Since there are neither allegations nor facts suggesting that the Secretary acted beyond the scope of his powers in finding that the statutory criteria were satisfied, the sole issue is whether his findings were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". 5 U.S.C. § 706(2)(A).

■ From an examination of the record, the Court is unable to conclude that the Secretary acted in an arbitrary or capricious manner in finding that the appropriate statutory criteria had been satisfied. The proposed airport was included in the National Airport Plan for 1969–73. There is some controversy, however, as to whether the airport construction is consistent with the Richmond Regional Airport System Plan, prepared for the Richmond Planning District Commission. This report apparently concludes that the practical capacity of Byrd International Airport operations per year is 292,000. The environmental impact statement, however, concludes at ¶ 4(c) that the practical annual capacity is between 210,000 and 230,000 operations. If this difference had been unexplained, a conclusion that the Secretary had acted arbitrarily in finding that the new facility is consistent with area development plans would perhaps be justified. It appears, however, that this difference in figures is explained by an uncontradicted statement of the Assistant Secretary for Environment and Urban Systems contained in a memorandum to the Under Secretary to the effect that the consultant preparing the regional plan failed to use detailed calculations, whereas the practical annual capacity of 215,000 operations which was considered by the Secretary, and which gave rise to the 210,000 to 230,000 figure, was based on "a detailed capacity study in accordance with estab-

lished procedures." (See Memo dated September 27, 1971, part of Defendants' Exhibit C). The Court cannot conclude, insofar as these figures are material, that the result reached was an abuse of discretion.

■ The criteria concerning independent funding, possible delays, property ownership, and landing aid plans are all covered in the Request for Aid Application and the Project Application submitted by the county and in the Grant Agreement. From these documents, the Court concludes that the Secretary did not act arbitrarily or abuse his discretion in finding that the criteria had been satisfied.

■ The requirement that fair consideration be given to the interest of communities in or near the project is somewhat more difficult to evaluate. Plaintiffs note the varied development of the area and suggest that parks, hospitals, schools and residential areas will be affected by the airport. Yet the vagueness of the requirement suggests that the Court's function is limited to little more than determining that the Secretary in approving the project was satisfied that these community details and the impact upon them of the airport were considered. The fact that they were so considered is clear. Not only is mention made of community factors in the impact statement, but the FAA examined the plaintiffs' response to that statement in which potential ill effects are vividly described. This consideration is all that the statute requires.

All assurances required by 49 U.S.C. § 1718 were made to the Secretary in the Project Application, satisfying that requirement.

## II.

■ The plaintiffs in addition, contend that approval of the project under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., was without substantial evidence in the record. Plaintiffs appear to have misconstrued the nature of this act. NEPA does no more than require federal agencies to consider environmental effects in certain federal projects and to file a statement concerning these effects. It is clear that the Secretary has done so in this case. The act provides no substantive conditions that must be met before a federal project may be approved. Thus, the "substantial evidence" test is irrelevant as far as NEPA is concerned.

■ Plaintiffs further allege that comments received when the draft environmental statement was circulated indicated that this project would have certain adverse effects on the environment. Plaintiffs assert that the final impact statement offered no substantive solutions to the problems. For the reasons noted above, the Court finds this argument to be without merit, as far as NEPA is concerned. NEPA does not require that solutions be proposed for all potential environmental problems created by a federal project. Rather, the act is designed to ensure that environmental factors are considered by agencies in all of their acts to the end that encouragement be given to the declared national policy of productive and enjoyable harmony between man and his environment. Congress did not see fit to require, within the framework of this act, agencies to take the sort of affirmative substantive steps that plaintiffs contend.

## III.

■ Plaintiffs' position as to substantial evidence being required with reference to the Secretary's findings mandated by 49 U.S.C. § 1716(c)(4) are well taken and require an analysis of the evidence before the Secretary.

Title 49 U.S.C. § 1716(c)(4) provides, in pertinent part, the following:

(4) It is declared to be national policy that airport development projects authorized pursuant to this subchapter shall provide for the protection and enhancement of the natural resources and the quality of environment of the Nation. In implementing this policy, the Secretary shall consult with the Secretaries of the Interior and Health,

Education, and Welfare with regard to the effect that any project involving airport location, a major runway extension, or runway location may have on natural resources including, but not limited to, fish and wildlife, natural, scenic, and recreation assets, water and air quality, and other factors affecting the environment, and shall authorize no such project found to have adverse effect unless the Secretary shall render a finding, in writing, following a full and complete review, which shall be a matter of public record, that no feasible and prudent alternative exists and that all possible steps have been taken to minimize such adverse effect.

Plaintiffs' challenge to the Secretary's performance pursuant to this section is twofold: (a) that the environmental impact statement does not satisfy the requirements of a finding in writing following a full and complete review, and (b) that the Secretary's conclusion concerning environmental effects of the project and alternatives to it is not supported by substantial evidence.

As to the first claim, it is the plaintiffs' contention that the "Federal Findings" (*supra*) contained in the impact statement do not satisfy the requirements of § 1716(c)(4). Although plaintiffs assert that the findings here were made for NEPA purposes, rather than to satisfy the § 1716(c)(4) requirement, the essence of their argument is that the Secretary or a member of his office did not *personally* render the requisite findings. This contention embraces the argument that the findings are conclusory in nature, and fail to satisfy the asserted congressional purpose that there be detailed written findings.

An examination of the record before the Court, however, does not sustain plaintiffs' position.

By memorandum dated August 20, 1971, Herbert F. DeSimone, Assistant Secretary of Transportation for Environment and Urban Systems, requested approval by James Beggs, Under Secre-

tary of Transportation, of Chesterfield's request for airport funds and of the required impact statement which had been filed on July 20, 1971, by the Airport Division of the FAA. In essence, Beggs was requested to adopt the FAA's statement, which he did in his capacity of Acting Secretary of Transportation. As the Court heretofore noted, thereafter Beggs requested that an additional review be effected, the results of which were contained in a report of September 28, 1971, covering the objections made by plaintiffs and which in essence reaffirmed the original impact statement.

■■ The fact that the impact statement was prepared for the purpose of satisfying NEPA does not prevent its being used to satisfy the requirements of § 1716 if, in fact, it contains all of the findings demanded by that provision. Moreover, while plaintiffs argue that the "Federal Findings" paragraph of the impact statement is conclusory, and thus fails to satisfy § 1716(c)(4), the Court is satisfied that the whole impact statement must be considered as the § 1716(c)(4) findings. As such, the findings are not at all conclusory.

■ After a careful examination of both the impact statement and the relevant statute, the Court concludes that the Secretary of Transportation individually is not required to review the case and render written findings, but may delegate the responsibility to agency personnel within his department, including members of the FAA. Unlike the federal "wiretap" law, 18 U.S.C. § 2516, see United States v. Giodano, 469 F.2d 522 (4th Cir., 1972), the legislative history of the Airport and Airway Development Act does not suggest that Congress intended that the Secretary of Transportation or Congressionally authorized members of his staff be required personally to prepare and render findings. 1970 U.S. Code Congr.Admin.News [Vol. II] p. 3057. Indeed, the sort of review and findings that were obviously intended could not by the very magnitude of study required be prepared personally by

the Secretary or his separate staff for every proposed project.

■ A more serious question arises, however, as to whether an impact statement can be used to satisfy the statutory requirements where, as here, the draft was prepared initially by the sponsoring body, the Board of Supervisors. Such a procedure understandably gives rise to a presumption that same is at the least self-serving and not wholly objective. Standing alone such would, in the Court's opinion, be insufficient to satisfy the requirements of § 1716(c)(4), which requires an independent review by the Department of Transportation of the environmental effects of a project.

■ In the instant case, however, any such presumption is overcome by virtue of the actions taken subsequent to the submission by the plaintiffs of their response to the impact statement, which action included, pursuant to direction of the Under Secretary of Transportation, a complete review of the case. This review of the data supporting the impact statement was carried out solely by the FAA and the office of the Assistant Secretary for Environment and Urban Systems, both of which are part of DOT. They issued a memorandum and report, the latter of which was made public, which in effect incorporated by reference the impact statement. The Court concludes that this procedure satisfies the requirements of § 1716(c)(4). It is the review itself which must be conducted independently by DOT. No infirmity arises if findings prepared in part by another group are adopted by DOT following such a review. Indeed, the file reflects that consideration was given by the Department of Transportation to each and every assertion raised by plaintiffs in their objections of September 21, 1971. It would appear that at least in this instance, the bureaucratic workings of big government in no way impeded prompt and full review of the views expressed by the Concerned Citizens.

Plaintiffs also challenge the sufficiency of the conclusion that the only adverse environmental effect is noise, that no feasible and prudent alternative exists as to the project, and that all possible steps have been taken to minimize adverse effects.

It appears to the Court upon careful examination of the impact statement that, while the summary states that noise was the only adverse effect, the Secretary also manifestly recognized other less obvious effects. Matters such as aesthetics, wildlife, and forests were all considered. Though some adverse effects on these were noted, the statement provided for remedies for these effects which, to the extent feasible, effectively neutralized them. The Court simply cannot, within its delineated responsibility, conclude that the Secretary abused his discretion in his ultimate conclusion.

Having concluded that there is an adverse environmental effect, the Secretary was required to look for feasible and prudent alternatives. Plaintiffs urge in this regard that the rather narrow scope of administrative discretion to determine feasible and prudent alternatives as described in Citizens to Preserve Overton Park v. Volpe, supra, which involved 49 U.S.C. § 1653(F), should apply here. To the extent possible the Court agrees, both because of the similarities in language and obvious purpose of the two provisions and because of the legislative history of § 1716(c)(4). See Report of the Interstate and Foreign Commerce Committee of the House of Representatives, H.R. No. 91–601, 1970 U.S.Code Congr.Admin. News [Vol. II] p. 3058.

*Overton Park* - dealt with a statute which requires the Secretary to disapprove any project which requires the use of parklands unless there is no feasible and prudent alternative to such parklands and unless such program includes all possible planning to minimize harm to the area, "wildlife and waterfowl refuge, or historic site resulting from such

use." The Court there held that in order to authorize the taking of parklands, the Secretary must find either that no feasible alternative exists or, if one exists, that it presents "unique problems." The Court emphasized that parklands should be taken only in exceptional circumstances.

 Because adverse environmental effects are likely to be encountered in the Chesterfield airport project, the Secretary was required to examine alternatives. Unfortunately, the noise pollution that will result from this project would to some extent cause an adverse environmental effect on any site chosen. In a sense, every alternative site presents a "unique problem." Similarly, the alternatives of no new construction at all or increases in existing facilities, while they must be considered, may not be feasible. It is impossible, therefore, for the Secretary to make the sort of clear-cut decision envisioned by *Overton Park,* where the statute did not regulate the taking of alternative non-parkland. Instead, he must examine various alternatives, normally choosing that which is least harmed environmentally. However, since the differences in effect on the various sites may not be great, non-environmental factors may occasionally outweigh the environmental differences.

 The Court considers its reviewing function limited to a determination of whether the Secretary did consider and balance various alternatives, giving paramount concern to the environment, and whether the result that he reached was arbitrary, capricious or an abuse of discretion. Although the Court's inquiry is to be searching and careful, it is not empowered to substitute its judgment for that of the Secretary. See Citizens to Preserve Overton Park v. Volpe, *supra,* 401 U.S. at 414, 91 S.Ct. 814.

 An examination of the impact statement reveals that ample consideration was given both to alternative sites and to the feasibility of disallowing construction of this project altogether. Environmental factors were considered. It is, unfortunately, a fact that noise and wildlife disruption would be caused at every site, and no site carried the potential for any unusual effects. In any event, the Court cannot say that these factors were given such slight consideration as to cause the Secretary's decision to be beyond the scope of his authority.

The Secretary's final decision to approve the construction at the site selected was supported by valid reasons which are apparent in the record.

The record reveals, in addition, that all possible steps, short of abandonment of the project, have been taken to minimize the adverse environmental effects. Unfortunately, little can be done to prevent all noise. The record reveals that the Secretary considered the fact that even by doubling the percent of forecasted use of the airport by business jets, which admittedly create a higher noise level than other single or twin engine aeroplanes, only approximately 12 daily business jet operations in 1980 are anticipated. In addition, it is contemplated that by 1980 the noise level of such jets will have been considerably reduced over the present. As presently contemplated, before a runway extension to permit jet operations is programmed, the environmental statement will be reviewed and if changes to the area activities and land uses have significantly occurred or aircraft operating characteristics have different effects at that point in the future, a completely new environmental study is to be undertaken.

The impact statement further reveals that any adverse effects on the oxygen-carbon dioxide exchange process will be avoided by reseeding buffer areas with evergreens. An historic cemetery and cedar tree are to be preserved. Wildlife will be protected by allowing no clearing to proceed in the late fall or winter, when relocation would be most difficult. In sum, the plans seek to minimize adverse environmental effects to the greatest extent possible.

## IV.

Plaintiffs next contend that the Secretary did not meet the statutory requirements of 49 U.S.C. § 1718(4), which states:

> As a condition precedent to his approval of an airport development project under this subchapter, the Secretary shall receive assurances in writing, satisfactory to him, that— . . . . (4) appropriate action, including the adoption of zoning laws, has been or will be taken, to the extent reasonable, to restrict the use of land adjacent to or in the immediate vicinity of the airport to activities and purposes compatible with normal airport operations, including landing and takeoff of aircraft.

Plaintiff alleges that assurances relative to zoning were made on September 20, 1971, while the Secretary actually approved the project prior to these assurances on August 20, 1971.

■ Upon examination of the record it appears to the Court that the Secretary's approval was actually given subsequent to September 20, not prior thereto. The approval dated August 20 was merely an initial authorization by the Under Secretary. Final project approval came after the sponsor's Project Application and is encompassed in the grant offer, dated October 6, 1971. It is thus clear that § 1718 assurances were made prior to the approval of the project.

## V.

The final attack on this project is based on the requirement of 49 U.S.C. § 1716(d) that the sponsor certify to the Secretary

> that there has been afforded the opportunity for public hearings for the purpose of considering the economic, social, and environmental effects of the airport location and its consistency with the goals and objectives of such urban planning as has been carried out by the community.

Section 1716(d)(2) requires the sponsor to submit a transcript of the hearing to the Secretary upon demand. Plaintiffs contend that a required hearing was not held nor a transcript prepared.

It is not disputed that there were two public hearings—one on August 19, 1969, and another on September 24, 1969, concerning the proposed airport. Plaintiffs argue, however, that these hearings were held prior to the effective date of the Airport and Airway Development Act and that such hearings provided only for the discussion of issues, and not a trial type hearing.

■ There is nothing in § 1716(d) which would suggest that an adversary hearing was envisioned. Indeed, the concept of "public hearings" refers to exactly the sort of quasi-legislative meetings that were held in this case: open public discussions, in which any one with an opinion on the project may express it. Citizens to Preserve Overton Park v. Volpe, *supra*, at 415, 91 S.Ct. 814.

The Court finds that the hearings before the Chesterfield Planning Board and Board of Supervisors satisfy the requirements of § 1716(d). The fact that they were held prior to the effective date of that section is irrelevant.

■ Although the statute does not by its express terms require that a verbatim transcript be taken of the hearings, it is a fair implication from the statutory language that such a transcript is contemplated and under certain circumstances the failure to provide same may render the hearings ineffective. In the instant case, however, plaintiffs have failed to show how the absence of such a transcript in any way affected the administrative process. The Secretary, so far as the record here reveals, did not make inquiry as to a transcript, or even suggest the need of one, and, even if he had, it is likely that the notes taken of the hearings would have sufficed. The statute does not intend a transcript to be a part of every administrative record, since it requires

only that the sponsor make available such a transcript if requested by the Secretary. The Secretary, in his discretion, may approve a project without benefit of a verbatim transcript. Section 1716(d) has not been violated.

Concluding, therefore, that the Secretary acted within the scope of his authority, as well as within the procedural requirements of law, the Court is required to render judgment for the defendant.

An appropriate order will enter.