CITIZENS FOR RESPONSIBLE AREA GROWTH (CRAG), Plaintiff,

and

the State of Vermont, Plaintiff-Intervenor,

v.

Brock ADAMS, Secretary of Transportation, Langhorne M. Bond, Administrator, Federal Aviation Administration, Gerald D. Curtin, Chief, Airports Division, Regional Office of the Federal Aviation Administration, Robert Bergland, Secretary of Agriculture, Gordon Cavanaugh, Administrator, Farmers' Home Administration, Brian Burns, State Director of the Farmers' Home Administration for New Hampshire and Vermont, Juanita Kreps, Secretary of Commerce, Robert Hall, Assistant Secretary for Economic Development, John E. Corrigan, Regional Director of the Economic Development Administration, the City of Lebanon, New Hampshire, Allen Perkins, Jr., in his capacity as Lebanon City Manager, the Lebanon Regional Airport Authority, Michael Donovan, in his capacity as Lebanon Regional Airport Manager, Defendants,

and

the State of New Hampshire, New England Legal Foundation, Defendants-Intervenors.

Civ. A. No. 79–61.

United States District Court, D. New Hampshire.

Aug. 23, 1979.

O'Neill, Backus, Spielman by Robert A. Backus, Manchester, N. H., Peter R. Teachout, South Royalton, Vt., for plaintiff.

M. Jerome Diamond, Atty. Gen., William E. Griffin, Asst. Atty. Gen., Atty. General's Office, State of Vermont, Montpelier, Vt., for State of Vermont, plaintiff-intervenor.

Brown & Nixon by Stanley M. Brown, Manchester, N. H., R. Peter DeCato, City Atty., Lebanon, N. H., for Lebanon defendants.

William H. Shaheen, U. S. Atty., Concord, N. H., for Federal defendants.

Robert R. Ruddock, Boston, Mass., Boston, Mass., for defendant intervenor New England Legal Foundation.

Steven J. McAuliffe, Asst. Atty. Gen., Concord, N. H., for defendant-intervenor State of New Hampshire.

## OPINION

ZOBEL, District Judge.

Plaintiffs are a nonprofit environmentalist corporation, consisting of New Hampshire and Vermont residents, and the State of Vermont. They seek injunctive and declaratory relief, alleging that construction at and near Lebanon (New Hampshire) Regional Airport is being undertaken by the defendants in violation of federal law. Defendants are various municipal, state and federal agencies and officials. While the complaint states a number of claims,[1] the parties have agreed that the only issues to be considered by the court with regard to the preliminary relief sought are compliance with Section 102(2)(C) of the National Environmental Policy Act of 1969 ("NEPA"), 83 Stat. 852, 42 U.S.C. § 4332(2)(C), and provisions of the Federal Airport and Airway Development Act of 1970 ("Airway Development Act"), 84 Stat. 219, 49 U.S.C. §§ 1701, et seq. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331.

## THE FACTS

The parties agree to certain facts. In 1978 and 1979 the Defendant City of Lebanon ("Lebanon") submitted to three federal agencies, Farmers Home Administration ("FmHA"), the Economic Development Administration ("EDA") and the Federal Aviation Administration ("FAA"), "preapplications" and applications for grant and loan monies to fund various construction and improvement proposals at and near the

---

1. In addition to the two claims cited above, plaintiffs allege violation of 49 U.S.C. § 1716(c), N.H.Rev.Stat.Ann. § 415:9, Vt.Stat.Ann., tit. V, §§ 291–295; 42 U.S.C. § 4331 and U.S.Const. Amends. V and XIV.

City's regional airport.[2] The proposals are at various stages of completion. Construction of the airport parking lot access roads, taxiways and underground utilities had been completed prior to the initiation of this action. The construction of the terminal building and related utilities is underway. An extension of the access road and underground utilities to the contemplated industrial park, as well as the runway extension, are in the design or bidding stage.

Two of the Federal agencies, EDA and FmHA, have approved the grant applications. They have also determined that the provisions of NEPA do not require preparation of an environmental impact statement ("EIS"). The third agency, FAA, has not as yet allocated the funds for which Lebanon has applied, as the 45-day comment period on its proposed findings had not at the time of the hearing in this case elapsed. A recent communication to the City, however, suggests that approval of the grant is imminent. The FAA's proposed "Negative Declaration" concludes that an EIS is not required. Further, the agency contends that a hearing conducted on May 17, 1978 in Lebanon satisfies the public hearing requirement of the Airway Development Act. The FAA, thus, finds no obstacle to the approval of the grant as quickly as possible, and all defendants have proceeded upon the premise that the FAA will presently adopt its proposed findings insofar as NEPA and the Airway Development Act are concerned.

Disputed facts liven this bare outline of grant awards and final agency pronouncements. Plaintiffs suggest that the three federal grants are related to one another, to an earlier phase[3] of the Airport development, and to an ultimate expansion of the industrial park from the initial 50 to 260 acres. Plaintiffs see a comprehensive air terminal-industrial park development program. Defendants instead see three independent projects. They acknowledge long-range consideration of the air park expansion but characterize expansion beyond the 50 acre proposal as nothing more than a possibility.

Defendants' current appraisal of the unrelatedness of their various proposals and of the tentativeness of park expansion represents a recent change of position. Earlier agency pronouncements clearly reached opposite "threshold" conclusions with respect to the integrity of the work to be done and to the need for an EIS. Mr. Weedon Parris, the lone FAA representative at the public hearing of May 17, 1978, announced that "the Environmental Impact Statement will be prepared by my agency, the Federal Aviation Administration." Correspondence of November 22, 1978 from the EDA's Regional Director, John Corrigan, to Lebanon's City Manager, Allen Perkins, advised "[i]t is our conclusion that the preparation of an environmental impact statement is required." These conclusions were summarily reversed at a private conference on December 7, 1978 apparently at the insistence of Congressman James C. Cleveland. No public announcements, let alone public hearings, preceded the reversal of the agencies' previously stated positions. Indeed, some concerned citizens requested permission to attend the conference but were refused.

I find that the various projects are related and that the ultimate expansion of the industrial park is clearly contemplated. The integrity of the grant proposals and of the park expansion has been considered by the defendants in the construction that has already taken place and has been provided for in the grants now before the court.

## THE LAW

The motion for preliminary injunction rests on two distinct claims. The first is

---

2. The projects are described in the grant documents as follows: "construction of an airport terminal building and the development of an industrial park", "utilities, water and sewer lines to the [proposed industrial park area]," "runway extension", "partial taxiway system", "runway lighting", "taxiway lighting", and "instrument landing system".

3. "Phase One" of construction included the parking lot, taxiways, access road to the terminal building, infrastructure to serve the building, and resurfacing of the runway.

that agency decisions to forgo preparation of an EIS violated NEPA. The second is that the FAA-sponsored hearing of May 17, 1978 in Lebanon did not satisfy the requirements of the Airport Development Act. The two claims are discussed in turn.

## I. National Environmental Policy Act of 1969 ("NEPA")

Section 102(2)(C) of NEPA provides as follows:

> The Congress authorizes and directs that, to the fullest extent possible: . . (2) all agencies of the Federal Government shall—
>
> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on [environmental impact]. 42 U.S.C. § 4332(2)(C).

Section 102(2)(C) creates a specific duty for federal agencies. The statute demands compliance "to the fullest extent possible", a command "neither accidental nor hyperbolic". *Flint Ridge Dev. Co. v. Scenic River Ass'n.*, 426 U.S. 776, 787, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976). The EIS requirement has been hallowed in federal courts by years of repeated enforcement[4] and by dramatic statements of purpose.[5]

In its most recent term, the Supreme Court reviewed § 102(2)(C), its legislative history, and applicable federal regulations. The Court delivered an unambiguous assessment of the significance of an EIS:

> The thrust of § 102(2)(C) is thus that environmental concerns be integrated into the very process of agency decision-making. The 'detailed statement' it requires is the outward sign that environ-

mental values and consequences have been considered during the planning stage of agency actions. If environmental concerns are not interwoven into the fabric of agency planning, the 'action-forcing' characteristics of § 102(2)(C) would be lost. 'In the past, environmental factors have frequently been ignored and omitted from consideration in the early stages of planning . . . . As a result, unless the results of planning are radically reversed at the policy level—and this often means the Congress—environmental enhancement opportunities may be foregone and unnecessary degradation incurred.' S.Rep.No. 91–296, . . . at 20. For this reason the regulations of the Council on Environmental Quality (CEQ) require federal agencies to 'integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values . . . .' 43 Fed.Reg. 55992 (1978) (to be codified, at 40 CFR § 1501.-2). *Andrus v. Sierra Club*, —— U.S. ——, ——, 99 S.Ct. 2335, 2337, 2338, 60 L.Ed.2d 943 (1979) (footnotes omitted).

Section 102(2)(C) of NEPA provides a mandate of uncommon clarity. As the Court observed in *Andrus v. Sierra Club, supra*, the EIS requirement effects NEPA's express purpose to imbed an early formal consideration of environmental impacts in all major agency decisions. As a practical matter, a threshold decision not to prepare an EIS may represent the last comprehensive environmental consideration a project receives. It is certainly the last opportunity for other agencies and the public to challenge the formal adequacy of environmental planning. The threshold determination, thus, is of profound importance. See *Mont Vernon Preservation Society v. Clem-*

---

4. "NEPA's mandate has been given strict enforcement in the courts." *Public Service Co. v. U. S. Nuclear Regulatory Com'n.*, 582 F.2d 77, 81 (1st Cir. 1978). See also W. Rogers, *Environmental Law*, 725, *et seq.* (1977).

5. See, *e. g. Mont Vernon Preservation Society v. Clements*, 415 F.Supp. 141, 145 (D.N.H.1976) ("The preparation of an EIS is, perhaps, the most essential and vital stage of the NEPA

process."); *Environmental Defense Fund, Inc. v. Corps of Engineers*, 325 F.Supp. 749, 759 (E.D.Ark.1971) ("an environmental full disclosure law"); *Essex County Preservation Ass'n. v. Campbell,* 399 F.Supp. 208, 214 (D.Mass. 1975) (Bownes, J., by designation) *aff'd* 536 F.2d 956 (1st Cir. 1976) ("to get all the cards on the table prior to 'any irreversible and irretrievable commitments of resources' ").

*ents, supra,* at 146 ("in failing to prepare an EIS, the intensive environmental examination directed by Congress is avoided.").

"The initial responsibility for determining whether an EIS should be prepared resides in the responsible federal agency." *No East-West Highway Committee, Inc. v. Whitaker,* 403 F.Supp. 260, 270 (D.N.H. 1975). It should be undertaken *"before a* significant project [is] launched." *City of Boston v. Volpe,* 464 F.2d 254, 257 (1st Cir. 1972) (emphasis in original). The sponsoring agency, which is uniquely able to assemble and assess project data, is governed in its initial decision both by the detailed regulations of the Council on Environmental Quality ("Council", "CEQ") and by the agency's own NEPA implementation regulations.

■ The law can be stated clearly: when there are "major Federal actions significantly affecting the quality of the human environment", 42 U.S.C. § 4332(2)(C), environmental impact statements must be prepared. *Aberdeen & Rockfish R. Co. v. Students Challeng. R.A.P.,* 422 U.S. 289, 319, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975). If there is no such action, no EIS is necessary. *Kleppe v. Sierra Club,* 427 U.S. 390, 401, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). The issue in the instant case is also clear. Defendants have concluded that the federal action requisite for an EIS is absent. Accordingly, they contend that no EIS is required. Plaintiffs dispute the conclusion, and argue that an EIS is required. The defendant's conclusion, then is the focus of this inquiry.

With respect to the appropriate standard of review in this case, Judge Bownes has stated the rule that I shall follow: " '[W]hen reviewing an agency's threshold determination not to file an EIS, the court' should review that decision against a standard of reasonableness." *Mont Vernon Preservation Society v. Clements, supra,* at 146, citing, *Essex County Preservation Ass'n. v. Campbell,* 399 F.Supp. 208 (D.Mass.1975) (Bownes, J. by designation) *aff'd,* 536 F.2d 956 (1st Cir. 1976).

## A. What is the "project"?[6]

■ From the start of this litigation considerable dispute has surrounded the description of the "project" *i. e.,* the constituent elements of the federal action in question. Long before this litigation, variations in administrative and judicial terminology and differing judicial constructions of "project" and "impact" under NEPA compounded this confusion.[7]

■ A "project" (federal action) and its "environmental impact" inarguably provide the basis for considering an agency's determination of the EIS requirement under 42 U.S.C. § 4332(2)(C). But an agency's description of a project and the environmental impacts it attributes to its project do not constitute the end of NEPA inquiry.

Federal defendants contend that 42 U.S.C. § 4332(2)(C) measures significant environmental impact only in terms of the narrow self-definition of a project. They argue for the strict enforcement of the

**6.** No independent consideration is required for the question of whether a project is "major." *Mont Vernon Preservation Society v. Clements, supra,* determines that all federal projects which could have a significant effect on the quality of the human environment must be considered "major" for purposes of § 102(2)(C). *Mont Vernon, supra,* at 146–147, citing *City of Davis v. Coleman,* 521 F.2d 661, 673 n. 15 (9th Cir. 1975), *M.P.I.R.G. v. Butz,* 498 F.2d 1314 (8th Cir. 1974), *McDowell v. Schlesinger,* 404 F.Supp. 221 (W.D.Mo.1975). That conclusion is endorsed in CEQ regulations, as well. 43 Fed.Reg. 56004 (1978) (to be codified, at 40 C.F.R. § 1508.18). This court's review will proceed on that basis.

**7.** I read "[p]roposals . . . for major Federal actions," 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1500.1(a) (1978), "proposed action," 42 U.S.C. § 4332(2)(C)(i) and (iii), 40 C.F.R. § 1500.1(a), (1978), "proposal" 42 U.S.C. § 4332(2)(C) (ii), and "administrative action," 40 C.F.R. § 1500.2(a) (1978) *et seq.,* as they are used in the instances cited to be synonymous with "project", as identified above. I take "environmental impact," 42 U.S.C. § 4332(2)(C) (i), "environmental effects," 42 U.S.C. § 4332(2)(C)(ii), effect "[on] the quality of the human environment," 42 U.S.C. § 4332(2)(C), and "effect of Federal decision," 40 C.F.R. § 1500.6(a) (1978) to be roughly equivalent descriptions of certain detectable environmental consequences of a "project".

agency's own project definition, except when there is "functional dependence" of concurrent projects of the same agency.[8] That contention is flatly contradicted by the statute, 42 U.S.C. § 4331(b), § 4332, § 4334; by judicial construction, see e. g. *Natural Resources Defense Council v. Callaway*, 524 F.2d 79 (2d Cir. 1975) (Navy EIS held deficient as failing to address the impact of independent dumping plans of Coast Guard and Army Corps of Engineers); and by CEQ guidelines and regulations, 40 C.F.R. § 1500.6(a), 43 Fed.Reg. 56004–5, 55994–5, 55993 (1978) (to be codified, at 40 C.F.R. §§ 1508.18, 1508.25, 1502.4, 1501.6).

The definition of "projects" is treated at length in provisions set forth by CEQ. CEQ guidelines were in effect until July 29, 1979, and apply to the FmHA and EDA declarations.[9] New mandatory regulations have more detailed definitions and apply to the forthcoming FAA final decision.[10] The Supreme Court has directed that in considering both guidelines and regulations, "CEQ's interpretation of NEPA is entitled to substantial deference." *Andrus v. Sierra Club*, —— U.S. ——, ——, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979) (citation omitted).

With respect to the determination made by EDA and FmHA, CEQ guidelines declare that:

'[M]ajor Federal actions significantly affecting the quality of the human environment' is to be construed by agencies with a view to the overall, cumulative impact of the action proposed, related Federal actions and projects in the area, and further actions contemplated. 40 C.F.R. § 1500.6(a) (1978).

The guidelines also require an EIS for an action localized in impact with a "potential" for significant effect; an action which is one of a number of projects or a "complex of projects", in which the cumulative effect is great; an action "precedent [to] action in much larger cases," action which "represents a decision in principle about a future major course of action", and individual agency decisions about partial aspects of a major interagency action. 40 C.F.R. § 1500.6(a) (1978).

The regulations which apply to the FAA decision are to the same effect. They define major federal action to include "[administrative actions] which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 43 Fed.Reg. 56005 (1978) (to be codified at 40 C.F.R. § 1508.25(a)(2)) *See also* 43 Fed.Reg. 56004 (1978) (to be codified, at 40 C.F.R. § 1508.7) (assessment of cumulative impact must consider other ac-

8. Defendants suggest that only "functional dependence" of projects will permit any consequence beyond the immediate impact of a discrete project to be considered in the threshold evaluation for significance of environmental effect. Defendants correctly observe that FAA's Negative Declaration includes reference to other projects, and indications that FmHA and EDA were aware of other agencies' involvement. Indeed, the agencies sometimes referred in their documents to an airport construction project. I do not conceive of that recognition, however, to detract from defendants' claim that I should measure the three distinct environmental impacts of "three (3) projects which operate independent of each other . . . [funded by] three separate and distinct agencies who received three separate and distinct grant applications." Defendants' Memorandum in Opposition to the Preliminary Injunction, at 17.

9. See generally 40 C.F.R. § 1500 *et seq.* (1978). See also 43 Fed.Reg. 55978, *et seq.* (to be codified, at 40 C.F.R. § 1500 *et seq.*), in which the

guidelines are superceded by mandatory regulations. See *Andrus v. Sierra Club*, —— U.S. ——, ——, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979).

10. The final determinations occurred February 26, 1979 (FmHA) and in March of 1978 (EDA). The final FAA Declaration had not been released at the time of the hearing but was properly before the Court. See *Kleppe v. Sierra Club*, 427 U.S. 390, 409, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976) ("This contention properly is before us, for the petitioners have made it clear they do not intend to prepare such a statement.") See also *City of Boston v. Volpe*, 464 F.2d 254, 257 (1st Cir. 1972) (Hearing on preliminary injunction conducted when "[n]o final statement ha[d] yet been issued. In the meantime, preparatory work ha[d] gone forward and . . . construction [had] beg[un].").

tions "regardless of what agency (Federal or non-Federal) or person undertakes [them].").

■ The regulations and guidelines do not require an EIS when a project itself is merely contemplated. Indeed, an EIS is not required in that case. *Kleppe v. Sierra Club,* 427 U.S. 390, 401, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).[11] The guidelines do require an EIS for actions *already proposed* when such actions—in relation to other actions contemplated, nearby, or related—will have a significant cumulative or potential impact on the environment. 40 C.F.R. § 1500.6(a) (1978); 43 Fed.Reg. 56005 (1978) (to be codified, at 40 C.F.R. § 1508.25).

■ Both the guidelines and regulations, thus, require that the cumulative effect of *impact,* and not merely the functional integration of projects, must guide agencies' threshold determinations of significant impact. Agencies, of course, may divide projects among themselves. The guidelines plainly state, however, that the responsibility to perform a comprehensive initial assessment of environmental impact under NEPA is not diminished by a limited

project definition. 40 C.F.R. § 1500.6(a) (1978), 43 Fed.Reg. 56005 (1978) (to be codified, at 40 § C.F.R. 1508.25).

The Supreme Court endorsed CEQ's position in *Kleppe v. Sierra Club, supra,* concluding that a comprehensive EIS is required "when several proposals for [generically]-related[12] actions . . . will have cumulative or synergistic impact upon a region." *Id.,* at 410, 96 S.Ct. at 2730. The Court declared that "[c]umulative environmental impacts are, indeed, what require a comprehensive impact statement". *Id.,* at 413, 96 S.Ct. at 2732.

■ Defendant agencies nevertheless insist that their characterization of the grants and the work at the Lebanon Airport as three distinct projects is correct, and that their expert definition is entitled to great deference.

In the first place, that characterization is not borne out by the recent history of the development of this work. The earliest hearings of Lebanon's City Council,[13] public hearings in the region,[14] reports in the press,[15] the Airport Master Plan,[16] and fed-

**11.** In *Kleppe,* the Court reviewed a collection of completed environmental impact statements to weigh plaintiff's demand for a single comprehensive EIS for a defined region. The Court rejected the claim, acknowledging agency expertise in defining regions for an EIS and in assessing feasibility of preparation. Plaintiffs in the instant case correctly observe that an agency's decisions of how to constitute the scope of an EIS are traditionally accorded far greater deference than an agency decision to segment a project to avoid preparing an EIS. See *infra,* at 1002.

**12.** 43 Federal Register 55995 (1978) (to be codified, at 40 C.F.R. § 1502.4(c)) directs that the scope of a comprehensive EIS may depend on a common (1) geographic relation, (2) generic relation, or (3) stage of development.

**13.** In its April 5, 1978 meeting, the Lebanon City Council adopted Resolution # A1, which noted the interdependence of the airport and airpark programs and the interdependence of their funding. The minutes of the meeting contain the following entry:

> City Manager Perkins explained that the industrial park could not be considered separately because in order to receive federal

funding the airport improvements must be included in the project.

**14.** The May 17, 1978 public hearing on the runway extension treated considerable public discussion of the relationship between the industrial park and the airport expansion. See Transcript of May 17, 1978 Public Hearing, Defendants' Exhibit 8, remarks of Representative Cory, Representative Townsend, and Mr. Norman.

**15.** Newspapers in the region have accorded considerable attention to the project. Articles and editorial columns often treated the airport expansion and airpark development together, referring generally to the Airport "improvements" or "expansion", *See, e. g.* Granite State Gazette (Lebanon, N.H.) Nov. 30, 1978, at 4; Valley News (White River Junction, Vt.) Sept. 22, 1978, at 1.

**16.** In Lebanon's Airport Master Plan, the consultant recites as its "conclusion" that while "it is evident" that the Airport will "operate at a deficit until 1981 . . .", " it is clear . . that the proposed industrial park plays a significant role in the economic future of Lebanon Regional Airport."

eral grant awards[17] all provide evidence that the citizens and officials of Lebanon, as well as federal officials, saw the airport construction as related to the "airpark" development.

Moreover, the defendants' claim that "project" definitions may embrace narrow and short-term agency perspectives is plainly contradicted by their own agency regulations. FAA regulations require an EIS when "an action would permit further contemplated actions" of the FAA or another agency and when the cumulative impact would be significant. 42 Fed.Reg. 32649 (1977), incorporated, 14 C.F.R. § 152.23(6) (1979). FmHA regulations direct that "major federal action . . ." be "viewed as to the overall, cumulative impact of the proposed action, related Federal actions in the area, and further actions contemplated." 7 C.F.R. § 1901.304(a) (1978). The regulations suggest that secondary environmental effects might prove more significant than proximate effects. 7 C.F.R. § 1901.304(a)(b) (1978). They further describe a laudable policy of cooperation with other federal agencies in the development of joint EIS's. 7 C.F.R. § 306(a)(b) (1978). EDA Regulations, while less extensive, are to similar effect. 13 C.F.R. § 309.18 (1979).

Finally, different legal consequences flow from decisions to segment a project made prior to the threshold determination than the same decision made after the finding of significant effect: "The determination that an EIS is not required must be closely scrutinized for, in failing to prepare an EIS, the intensive environmental examination directed by Congress in its passage of NEPA is avoided." *Mont Vernon Preservation Society v. Clements*, 415 F.Supp. 141, 146 (D.N.H.1976). Courts have distinguished "negative declaration" cases, *See, e. g. Natural Resources Defense Council, Inc., v. Grant*, 341 F.Supp. 356 (E.D.N.C.1972), from EIS "scope" cases, *See e. g. Sierra Club v. Kleppe, supra* and *Sierra Club v. Froehlke*,

534 F.2d 1289 (8th Cir. 1976), upon which latter cases defendants rely. The former cases, although decidedly less common, uniformly acknowledge as an extra factor in their consideration that compliance with 42 U.S.C. § 4332(2)(C) requires a full and accurate project description at the time of the threshold determination. *Rhode Island Com. on Energy v. General Services Administration*, 397 F.Supp. 41, 56 n. 28, (D.R.I. 1975) (Noting 40 C.F.R. § 1500.6(a) (1978) and rejecting both the argument that one program element "can be viewed separately from [the agency] decision" and the agency's dependent conclusion that the project did not come within 42 U.S.C. § 4332(2)(C)). *See also, NRDC v. Grant, supra*, at 367 (Rejecting agency's decision to forgo an EIS: "The cumulative impact with other projects must be considered."); *People of Enewetak v. Laird*, 353 F.Supp. 811, 821 (D.Hawaii 1973) (Rejecting segmentation of projects: "Almost every project can be divided into smaller parts, some of which might not have any appreciable effect on the environment."). Thus, defendants' claim that three independent projects are under consideration not only clashes with NEPA's language, judicial construction and CEQ implementation in guidelines and regulations, but it belies the plain fact that the defendants themselves once treated the proposed and completed construction at Lebanon Airport as one project. I conclude that in order to assess the significance of environmental impact under NEPA, the projects must be treated as one.

B. Were the decisions as to the effect on the environment reasonable under the circumstances?

The parties agree that 42 U.S.C. § 4332(2)(C) requires the agencies to determine whether the impact of their project on the quality of the human environment will be significant.[18]

---

17. *See, e. g.* EDA's "Offer of Grant". The first sentence includes the following designation: ". . . consisting of the construction of an airport terminal building and the development of an industrial park (hereinafter the "Project") . . .".

18. Only one party disputes that statement of the threshold question. Lebanon defendants add the word "adversely" to 42 U.S.C. § 4332(2), and recite that language throughout their memoranda. Because the word "adversely" does not appear in 42 U.S.C. § 4332(2), and

The CEQ guidelines applicable to EDA and FmHA require that the threshold determination be made "with a view to the overall cumulative impact of the action proposed, related Federal actions and projects in the area, and further action contemplated." 40 C.F.R. § 1500.6(a) (1978). The regulations applicable to the FAA determination describe "[c]umulative impact [as] the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency . . . undertakes such other actions." 43 Fed.Reg. 56004 (1978) (to be codified, at 40 C.F.R. § 1508.7).

The initial decision requires, thus, that the agencies look not only to the full scope of the present project, but also to the overall cumulative effect of the ultimate project. They must consider the effect of past and future actions, which, while perhaps not "projects" themselves, augment the potential impact of the proposed action.

Defendants Lebanon, FAA, and EDA concede that if the 200 acre industrial park expansion were to be considered under 42 U.S.C. § 4332(2)(C), an environmental impact statement would be required. The EDA "Offer of Grant" so specifies. EDA's Negative Assessment concurs. November 1978 correspondence to Lebanon from EDA's Regional Director, and from FAA's Airports Division Office, reach the same conclusion. The question for this Court,

then, is whether the decisions of the agencies to exclude the airport-airpark expansion from their threshold determination of the other federal proposals was "reasonable considering all the circumstances." *Mont Vernon Preservation Society v. Clements,* 415 F.Supp. 141, 147 (D.N.H.1976).

■ Defendants again argue for a restricted view of the agencies' duties to assess the environmental impacts of projects under NEPA. They deny that NEPA requires consideration of any future actions—including actions of their own agency—unless the subsequent action has ripened to proposal status.[19] Although the agency negative determinations did not take the restricted view of their proposals and impacts for which counsel now argue, the scope of the Negative Declarations was essentially limited to the respective proposals under grant consideration.

In the case of each federal defendant, agency regulations demand a broader inquiry. FAA Regulations restate the requirement that "over-all cumulative impact" and "consequences of subsequent related actions" be considered. 42 Fed.Reg. 32649 (1977), incorporated, 14 C.F.R. § 152.-23(6) (1979). The regulations specifically warn of the danger of individual agency Negative Declarations when an interagency project would have a significant cumulative impact. *Id.* Further, they require an EIS when an action would permit further contemplated actions "of the FAA or another

because no explanation of the addition is offered, I assume that the statute is merely misquoted.

**19.** Defendants place considerable reliance upon a footnote in *Kleppe* which notes that NEPA "speaks solely in terms of *proposed* actions." *Kleppe v. Sierra Club,* 427 U.S. 390, 410, n. 20, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976) (emphasis in original). The footnote explains: "[NEPA] does not require an agency to consider the possible environmental impacts of less imminent actions *when preparing the impact statement on proposed actions." Id.* (emphasis added). Both the footnote and *Kleppe* itself refer to cases in which an EIS is prepared. But contemplated actions which have not reached the proposal stage may certainly play

a critical role in assessing the impacts of current proposals, and CEQ regulations require that they be considered. 43 Fed.Reg. 55997, 56005 (1978) (to be codified, at 40 C.F.R. §§ 1502.20, 1508.25). The suggestion that those contemplated actions must also be subjects of assessments of their own "environmental effects"—for which plaintiffs in *Kleppe* argued—was rejected. Defendants read footnote 20 to opine that only another project which independently requires an EIS must be considered in determining possible cumulative effects of a current proposal. *Kleppe* does not suggest such a narrow restriction on EIS requirements, and the CEQ Regulations clearly reject it. See 43 Fed.Reg. 56005–6 (1978) (to be codified, at 40 C.F.R. § 1508.25, § 1508.28).

agency," and the cumulative impact would be significant. *Id.* FmHA regulations echo the CEQ regulations: the project "must be viewed as to the overall cumulative impact of the proposed action, related Federal actions in the area and further action contemplated." 7 C.F.R. § 1901.-304(a) (1978). The regulations also encourage coordination of the assessment with the assessments of other agencies. 7 C.F.R. § 1901.306 (1978). EDA guidelines define "actions" to include both "projects and continuing activities." 13 C.F.R. § 309.18(a) (1979). The guidelines require "[c]onsideration of an action's direct and cumulative effects". 13 C.F.R. § 309.18(a)(5) (1979). Defendants' position upends the specific requirements of their regulations. The agencies deem the airpark expansion "contemplated," but deny the need to consider its impact with respect to their current proposals, notwithstanding language of their regulations to the contrary.

Official opposition to proposals represents another crucial factor in agency determination. FAA Regulations *require* preparation of an EIS when an action is opposed by any state agency. 42 Fed.Reg. 32649 (1977), incorporated, 14 C.F.R. § 152.23(6) (1979). In this case, the State of Vermont has taken the rather extreme action of seeking an injunction pending preparation of an EIS. FAA intimates no plan to comply with that demand of its own accord.

In a similar context, (H.U.D.'s violations of its EIS regulations), the district court concluded that "[a] government agency is bound by its own regulations." *Silva v. Romney*, 342 F.Supp. 783 (D.Mass.1972), *vacated in part and remanded*, 473 F.2d 287 (1st Cir. 1973) (remanded to consider broadening injunction). In directing the district court to consider enjoining additional parties, the Court of Appeals harkened to NEPA's forceful statement of agency duties and observed:

> These duties are not discretionary, but are specifically mandated by Congress, and are to be reflected in the procedural process by which agencies render decisions. *Silva v. Romney*, 473 F.2d 287, 292 (1st Cir. 1973).

The evidence adduced at the hearing on plaintiff's request for a preliminary injunction makes clear that after its initial decision requiring an EIS, EDA reached agreement with Lebanon to "negate implementation of the overall plan", i. e., to waive NEPA compliance until the City reached a subsequent stage of airpark construction. Thus it sought to define the initial 50 acre portion of the airpark as "a discrete project and not a segmented one."

 Moreover, EDA's final negative declaration rests on the capacity of the parties to agree to "mitigate" certain adverse effects by a written plan, to be approved by EDA, so that "[the project] would not effect [sic] the quality of the human environment." Piecemeal evaluations to prevent anticipated adverse effects of programs clearly cannot relieve obligations that exist under 42 U.S.C. § 4332(2)(C). Nor can private agreements between parties delay the application of the statute. The EDA assessment unmistakably concludes that, without adjustment, Lebanon's proposal would meet the 42 U.S.C. § 4332(2)(C) threshold of significant effect. A strategy which seeks to bypass an EIS is blearily inconsistent with the intent of NEPA: "[i]t is clear that environmental law requires that a federal agency involve itself early and continuously with EIS's in considering its programs and projects." *Massachusetts Air Pollution & N. Abate Com. v. Brinegar*, 499 F.2d 125, 126 (1st Cir. 1974). In short, the agency cannot bargain to waive NEPA compliance: "the NEPA requirement exists to protect the public at large and other interested agencies." *New England Coalition v. U. S. Nuclear Regulatory Com.*, 582 F.2d 87, 94 (1st Cir. 1978).

FAA's Draft Negative Declaration states a conclusion of no cumulative project impact based on the EDA's Negative Assessment. The FAA "[relies] on [EDA] expertise in this area." Insofar as the soundness of EDA's decision is infected by its "agreement" with the City of Lebanon, the FAA Declaration is deficient.

Further, FAA's decision reflects an unexplained "about face" of its own. Its November 1978 letter to Lebanon's City Manager concurs in the EDA conclusion with respect to the need for an EIS, and advises that an EIS should include the "terminal/industrial area complex, [and] the proposed extension of Runway 18–36", "to enable the issues of interrelationship and cumulative effects of the various actions to be clearly set forth and addressed on the record before any federal conclusions are made." The June 1979 Negative Declaration reversed the earlier conclusion that the runway expansion must be assessed to satisfy NEPA. Noting the opposing view that "the runway extension 'piecemeals' the environmental impact", the report nevertheless abandons the earlier conclusion of cumulative effects and interrelationship without explanation.

Insofar as FAA's decision rests upon the EDA "agreement" to defer an EIS, it suffers the legal deficiencies described above. Insofar as it abandons, without explanation, its prior statement that an EIS is required, it is unreasonable.

II. Airport Development Act of 1970

■ 49 U.S.C. § 1716(d)(1) requires a "sponsoring agency" to afford

the opportunity for public hearings for the purpose of considering the economic, social, and environmental effects of [an] airport location and its consistency with the goals and objectives of such urban planning as has been carried out by the community.

On May 17, 1978, the FAA sponsored a hearing in Lebanon to consider expressions of public opinion. Members of plaintiff organization and other critics of the proposed runway extension spoke at the hearing. A transcript of the hearing was conveyed to the FAA as required by the statute, and a copy is in evidence. Plaintiffs now challenge the adequacy of the hearing, attacking the subject and time limits placed on the comments of certain speakers.

Plaintiffs' challenge is unavailing. "[N]othing in § 1716(d) . . . suggest[s] that an adversary hearing was envisioned." *Citizens Airport Com. of Chesterfield County v. Volpe*, 351 F.Supp. 52, 62 (E.D.Va.1972). While the public hearing did not meet the standards for which plaintiffs argue, the hearing was a free-swinging meeting, an open public discussion, "in which any one with an opinion on the project [could] express it." *Citizens Airport Com. of Chesterfield County v. Volpe, supra,* citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The transcript reflects spirited participation from the floor, specifically from members of the plaintiff organization. The statute contemplates just such a hearing.

## PRELIMINARY INJUNCTION

■ The claim for a preliminary injunction raises a most difficult question. With Judge Bownes, "I do not believe that there should be an ironclad rule that whenever there has been any kind of violation of NEPA, an injunction must issue." *Essex County Preservation Ass'n. v. Campbell,* 399 F.Supp. 208, 218 (D.Mass.1975) (Bownes, J. by designation), *aff'd,* 536 F.2d 956 (1st Cir. 1976). At the same time, I believe NEPA's strict procedural mandate, and its forceful statement of purposes, must adjust the court's view of traditional equitable requirements when violations are major.

In its affirmance of *Essex County Preservation Ass'n. v. Campbell, supra,* the First Circuit noted instances in which there is "less need to balance other factors before deciding whether to issue a preliminary injunction." 536 F.2d at 963. Among them, it included cases in which an EIS is required and the agency produces none at all. *Essex County Preservation Ass'n., supra, citing Lathan v. Volpe,* 455 F.2d 1111 (9th Cir. 1971).

This is one such case. Defendants' noncompliance is not "technical". It is complete. The traditional requirements for injunctive relief, then, must be broadly construed to favor the enforcement of NEPA's requirements with injunctive relief.

■ In order for the preliminary injunction to issue, the plaintiff must show (1) that there will be irreparable harm, (2) that there is a likelihood of success on the merits, and (3) that the public interest requires issuance of an injunction. *Essex County Preservation Ass'n. v. Campbell, supra,* 399 F.Supp. at 218.

### 1. Irreparable Harm

■ The environmental effects of any major construction plan, permanent in nature and broad in scope, are necessarily significant. The consequences of this program, whether regarded as beneficial or harmful, must be regarded by all as long-term and significant. As a result, "the word 'irreparable' must be given a broad and expansive meaning". *Society for Pro. of New Hampshire Forests v. Brinegar,* 381 F.Supp. 282, 283 (D.N.H.1974).

Engineering and construction at the airport site proceed apace. Much of the construction which should be included in an EIS has been completed. That cannot be changed. *Ogunquit Village Corp. v. Davis,* 553 F.2d 243 (1st Cir. 1977). Other imminent design and construction have not yet "progressed so far that meaningful future federal decisionmaking has been foreclosed." *Ogunquit Village Corp. v. Davis, supra,* at 245 (citations omitted). That construction, if allowed to proceed, may commit the defendants to a course of action which could not be reconsidered when an EIS is prepared. Unless precedent action is enjoined, continued construction will more fully assure that a "violation of NEPA is insulated from remedy". *Ogunquit Village Corp. v. Davis, supra,* at 245.

In this case, I find that defendants have committed themselves not only to construction actually completed, but to the construction of the terminal building, the pumping station and utilities to service the terminal building. I find, however, that any further undertaking which will advance development of the proposed runway and the industrial park, pending an adjudication on the merits, will cause irreparable harm. Should plaintiffs prevail on the merits,

NEPA requires that defendants prepare an EIS to determine what changes can still be made. *Jones v. Lynn,* 477 F.2d 885, 889 (1st Cir. 1973). No steps taken between now and the time of a final adjudication should further imperil the comprehensive assessment of options that NEPA requires.

### 2. Likelihood of Success on the Merits

I find and rule that, as pertains to the NEPA claim, the plaintiffs are likely to succeed on the merits. As to the claim under the Airport and Airway Development Act, 49 U.S.C. § 1716(d)(1), I find that the plaintiffs are not likely to succeed on the merits.

### 3. Public Interest

NEPA enacts a national policy of environmental planning. The belief that "each person should enjoy a healthful environment", 42 U.S.C. § 4331(c), depends almost completely on the requirement that agencies fulfill NEPA requirements "to the fullest extent possible". 42 U.S.C. § 4332.

In the instant case, defendants changed an earlier decision to prepare an EIS in part because the expense involved in preparation was deemed too great. They now argue that the cost of interrupting the project is also too great. On balance, they argue, enforcing NEPA would be a setback to the public interest.

NEPA is an authoritative repudiation of the notion that economy alone advances the public interest. In enacting NEPA, Congress acknowledged that compliance would impose certain costs and inconvenience. See S.Rep.No. 91–296, p. 19 (1969). Congress has determined that the cost of compliance is warranted. That decision I cannot gainsay.

Furthermore, I weigh heavily the interest of the State of Vermont, the intervening plaintiff in this action. Vermont's border lies near the construction site. Nonetheless, throughout the planning and construction at issue, the City of Lebanon and its federal sponsors have done little to acknowledge the stake of the Vermont public

in the environmental consequences of this project. Under the circumstances, enforcement of NEPA may be the only remaining way to give voice to an important public interest.

A preliminary injunction will, therefore, issue forthwith and is attached as an appendix to this opinion. Plaintiffs will not be required to file a penal bond pursuant to Rule 65(c), Federal Rules of Civil Procedure, to cover losses should it be determined that defendants have been wrongfully enjoined or restrained. See *Boston Waterfront Residents Association, Inc. v. Romney*, 343 F.Supp. 89, 91 (D.Mass.1972), *Commonwealth of Massachusetts v. Andrus* [1978] 11 Envir.Rep. (BNA) 1138 (D.Mass. Jan. 28, 1978) (order granting preliminary injunction), 11 Envir.Rep. (BNA) 1147 (1st Cir. Jan. 30, 1978) (denying motion to stay).

So ordered.